UNITED STATES of America, Plaintiff-Appellee,

v.

John William SIMPSON, aka Brother John Simpson, Defendant-Appellant.

No. 71–1790.

United States Court of Appeals, Ninth Circuit.

May 4, 1972.

516

Norton Tooby, Menlo Park, Cal., for defendant-appellant.

James Bruen, Asst. U.S. Atty., James L. Browning, Jr., U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before KOELSCH, BROWNING, and ELY, Circuit Judges.

ELY, Circuit Judge:

On December 24, 1970, Simpson took a container of gasoline to the offices of the Local Board of the Selective Service System in San Jose, California. He intended—despite his knowledge that such acts were illegal—to burn some of the Board's records in an effort to move the United States toward terminating the conflict in Southeast Asia.

After surreptitiously gaining access to the Board's file room, he opened one of the file drawers, doused the contents with his gasoline, ignited a match, and set the files ablaze. When the heat from the fire became unbearable, Simpson retreated from the room. He remained in the building, however, and thus was, within moments, arrested.

For his vandalism, Simpson was subsequently indicted on three charges. He was charged with having destroyed government property valued in excess of $100,[1] with having mutilated and destroyed records deposited in a govern-

1. Title 18 U.S.C. § 1361 provides in pertinent part:

"Whoever willfully injures or commits any depredation against any property of the United States, or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United

ment office,[2] and with having interfered with the administration of the Selective Service System.[3] A jury convicted him of all three charges, and this appeal followed.

Simpson bases his appeal on asserted errors in the trial court's instructions to the jury and in its refusal to admit certain evidence offered by Simpson. Specifically, Simpson contends that the court (1) should have allowed evidence and given jury instructions regarding Simpson's claimed common law defense of "justification," (2) gave erroneous instructions on the meaning of "wilfully" as used in the pertinent statutes, and (3) was wrong in refusing to give instructions, proffered by Simpson, informing the jury of its power to acquit a defendant regardless of the evidence of his guilt. We conclude that none of the arguments has merit.

### I.

It has been acknowledged that otherwise criminal conduct may be justifiable, and thereby legally excused, when exigent circumstances have induced a defendant to act as he did. *See, e. g.,*

ALI Model Penal Code §§ 3.01 et seq. (1958 Tent.Draft No. 8). Actions taken in self-defense, in defense of property or other persons, or to avert a public disaster or a crime may be held noncriminal under this "justification" doctrine.[4]

During the trial, Simpson, pointing to the carnage and destruction in Indochina, sought to introduce evidence which, he argued, demonstrated that his actions hindering the Selective Service System were justifiably done to avert criminal acts and to defend property and persons in the war zone. He also urged the court to instruct the jury that it might find that his acts were non-criminal (*i. e.*, justifiable) upon the application of such a theory. The trial judge, noting the absence of authority supporting application of the "justification defense" in this context, rejected the proffered evidence and the requested instructions.

■ While Simpson's first contention is somewhat novel,[5] we think it is easily resolved. The theoretical basis of the justification defenses is the proposition that, in many instances, society benefits

---

States, or any department or agency thereof, shall be punished . . . ."

2. Title 18 U.S.C. § 2071(a) provides:
 "Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing filed with any clerk or officer of any court of the United States, or in any public office, or with any judicial officer or public officer of the United States, shall be fined not more than $2,000 or imprisoned not more than three years, or both."

3. Title 50 U.S.C. App. § 462(a) provides in pertinent part:
 "[A]ny person or persons who shall knowingly hinder or interfere or attempt to do so in any way, by force of violence or otherwise, with the administration of this title (said sections) or the rules or regulations made pursuant thereto . . . shall, upon conviction in any district court of the United States

of competent jurisdiction, be punished . . . ."

4. Typically, the use of force is permitted "when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by [another] person on the present occasion." Model Penal Code § 3.04 (1958 Tent.Draft No. 8).

5. The government contends that several cases have dealt with this issue. It cites United States v. Eberhardt, 417 F.2d 1009 (4th Cir. 1969); United States v. Moylan, 417 F.2d 1002 (4th Cir. 1969); and United States v. Berrigan, 283 F.Supp. 336 (D.Md.1968). In fact, none of those cases involved this question. All of those cases dealt with whether the defendants' sincere belief in (1) the illegality of the war in Vietnam, and (2) the moral righteousness of their acts would justify their otherwise criminal conduct. As was noted in the opinion in *Berrigan*, that defense "is analogous to the . . . defense of justification," 283 F.Supp. at 339, but it is not identical.

**518**

when one acts to prevent another from intentionally or negligently causing injury to people or property. That benefit is lost, however, and the theory fails when the person seeking to avert the anticipated harm does not act reasonably. Thus, it is commonly held, for example, that a person may not use excessive force in repelling an attacker or any force when the necessity therefor disappears. *See, e. g.,* Hopper v. Ross, 123 F.Supp. 371 (D.La.1954), aff'd, 228 F.2d 622 (5th Cir. 1956); State v. Weber, 246 Or. 312, 423 P.2d 767, cert. den. sub nom. Weber v. Oregon, 389 U.S. 863, 88 S.Ct. 121, 19 L.Ed.2d 131 (1967); Peaseley v. Puget Sound Tug & Barge Co., 13 Wash.2d 485, 125 P.2d 681 (1942).

■■■ Here, it is apparent that Simpson's reckless, dangerous acts were not reasonable. An essential element of the so-called justification defenses is that a direct causal relationship be reasonably anticipated to exist between the defender's action and the avoidance of harm. *See generally* 6 C.J.S. Assault and Battery §§ 92–95 (1937), 87 C.J.S. Trespass § 156 (1954), and the cases cited therein. It was unreasonable for Simpson to assume that any violent action he initiated might have any significant effect upon the supposed ills [6] that he hoped to remedy.[7]

## II.

■■ Since Simpson is guilty of the offenses charged only if he acted with the required criminal intent, the prosecution was required to prove that he acted "willfully and knowingly" (18 U.S.C. § 1361, 50 U.S.C. App. § 462) and "willfully and unlawfully" (18 U.S.C. § 2071). Simpson argues that "willfully" means "in good faith [and] without evil motive" and that, hence, the trial judge erred in instructing the jury that "the motive of the defendant is irrelevant." The law is otherwise. As to these statutes, "[t]he statutory requirement of willfulness is satisfied if the accused acted intentionally, with knowledge that he was breaching the statute." United States v. Moylan, 417 F.2d 1002, 1004–1005 (4th Cir. 1969). *See also* United States v. Boardman, 419 F.2d 110 (1st Cir. 1969).

None of the cases cited by Simpson convinces us that the *Moylan* court incorrectly decided this point. To the contrary, that decision fully demonstrates that Simpson's arguments are without authoritative support.[8] *See Moylan, supra,* 417 F.2d at 1004–1005.

## III.

Simpson's final contention is that the trial judge erred in refusing to instruct the jury, as Simpson requested,[9] that it

6. In his opening brief, Simpson argues that his specific intention was to prevent "(a) war crimes involving death or serious bodily injury to others . . . , and (b) death and serious bodily harm to others, and (c) a public disaster encompassing genocide, defoliation, and mass death to women and children."

7. The Vietnamese conflict could obviously have continued whether or not the San Jose, California draft board was able to restore its files and continue its lawful operation.

8. The cases upon which Simpson bases his argument are the same as those discussed in *Moylan.*

9. The requested instruction reads:

"The jury has the power to decide, according to its own judgment and conscience, all questions of law and fact involved in the issue of guilty or not guilty.

Juries may apply matter of fact and law together, and form their consideration of, and a right judgment upon, both.

The jury has the power to find the defendant not guilty even if the evidence of guilt is overwhelming or conclusive.

Jurors may not be punished for voting for acquittal, even if the evidence of guilt is overwhelming or conclusive.

Juries have the power to disregard the law in fact in reaching its verdict.

Juries, as representative cross-sections of their communities may, in conscience cases, nullify the law and the fact if they approve of the conceded acts of defendants."

had the power to acquit him regardless of the evidence of his guilt. The basis of this argument is the suggestion, now gaining some currency, *see, e. g.,* Scheflin, Jury Nullification: *The Right to Say No,* 45 S.Cal.L.Rev. 168 (1971); Sax, Rex v. Dean of St. Asaph's, Conscience and Anarchy: The Prosecution of War Resisters, 57 Yale Review 481 (1968), that juries should be given more freedom to grant acquittals against the law. It is argued that this freedom—which is assertedly necessary to a jury's proper functioning in our constitutional democracy—is attained by advising jurors of their "power to bring in a verdict in the teeth of both law and facts." Horning v. District of Columbia, 254 U. S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185, 187 (1920).

■ The "conscience verdicts" which result from exercise of this power often involve juries in the task of judging both law and fact. Even though facts may logically compel conviction under the law, we suspect that acquittal has nevertheless occasionally followed a jury's rejection of stated legal principles. This is a disturbing recognition, for in most courts,[10] including those in the federal system, such decisions conflict with the principle that "it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence." Sparf and Hanson v. United States, 156 U.S. 51, 102, 15 S. Ct. 273, 293, 39 L.Ed. 343, 361 (1895); *see Moylan, supra,* 417 F.2d at 1005–1007.

However, as long as general verdicts are rendered in criminal cases, certain verdicts that may be reasonably thought to rest upon the juror's rejection of the law will occur. They cannot be detected, since the courts "cannot search the minds of the jurors to find the basis upon which they judge." *Moylan, supra,* at 1006. *See, also* United States v. Sisson, 294 F.Supp. 511 (D.Mass. 1968). We acknowledge the truth that all such verdicts, especially when viewed in hindsight, cannot reasonably be said to have been undesirable.[11]

■ The basic question here is whether justice would be better served by instructing jurors as Simpson requested and thus opening the way for more "conscience verdicts." We think not. We agree with the decision in *Moylan* that the rule set forth in *Sparf* and *Hanson* remains correct. We have noted recent perceptive comments made by two distinguished former jurists, Abe Fortas and Simon Rifkind, during a panel discussion concerning the proper role of a jury. Mr. Justice Fortas emphasized that a contention, such as Simpson's,

"is an attack upon law itself. In effect, it is an assertion of the right of the individual to determine for himself what the standards of his conduct shall be. What is being proposed is not merely that jurors should be given the power to determine what is the law, but that they should be instructed that they may acquit a defendant even though they believe that he did something the law forbids. This goes to the heart of our society because it says that this shall not be a society in which there are general rules of law which apply to everybody and to which everybody is accountable." [12]

10. The exceptions are only Maryland and, perhaps, Indiana. *See Moylan, supra,* 417 F.2d at 1007, n. 17.

11. The cases of William Penn and John Peter Zenger illustrate how well our society's interests have been served by acquittals resulting from application by the jurors of their collective conscience and sense of justice.

12. The Center Magazine 60 (July, 1970). He also said:
"Jurors are not computers; sometimes they do come in with a verdict of innocent when a computer would say that the facts add up to guilt and that the defendant should be punished. We recognize and tolerate this as a worthwhile anomaly in the rule of law. But if this occasional departure from the gen-

**520**

In a similar vein, Judge Rifkind has remarked:

"[I am asked] why, if I am in favor of some kind of departures by the jury, I am afraid to make that universal. The answer is that one can have a fine musical composition made up of a theme with variations, but if you had a composition made up entirely of variations you would have discord. [This] proposal would create a law-less society, not a lawless society, but a law-less society, a society without law, without regulations. That is a monstrosity. No such society has ever existed or ever will exist." [13]

The jury occupies, and should continue to occupy, an independent role in our judicial system. It is recognized that jurors often reach "conscience" verdicts without being instructed that they have the power to do so. *See* H. Kalven & H. Zeisel: The American Jury 286–97 (1966). Equally important, American judges have generally avoided such interference as would divest juries of their power to acquit an accused, even though the evidence of his guilt may be clear. *See, e. g.*, United States v. Jackson, 436 F.2d 39, 42 (9th Cir. 1970); United States v. Garaway, 425 F.2d 185 (9th Cir. 1970); United States v. Spock, 416 F.2d 165 (1st Cir. 1969); United States v. Davis, 413 F.2d 148 (4th Cir. 1969). *Cf.* United States v. Sawyers, 423 F.2d 1335, 1340–1341 (4th Cir. 1970). Thus, the existing safeguards are adequate, and we refuse to make Simpson's suggested departure from our established law.

Affirmed.

eral application of the law were to be institutionalized—if it were to become the rule rather than the tolerated departure from the rule, we would have a kind of anarchy; that is, a system in which the ultimate test of socially permissible conduct is, to a significant degree, the random reaction of a group of twelve people selected at random. Acceptance

of this as the principle governing individual conduct which collides with the rules adopted by governmental processes would, of course, amount to rejection of law as the controlling principle of society." *Id.* at 61.

13. *Id.* at 66.