**UNITED STATES of America**

v.

**Rick BEST et al.**

**Crim. No. 79–CR–118 et al.**

United States District Court,
D. Colorado.

June 7, 1979.

Joseph F. Dolan, U. S. Atty., by Nancy E. Rice, Susan R. Roberts, Charles Casteel and Frank Kennedy, Asst. U. S. Attys., Denver, Colo., for plaintiff.

## MEMORANDUM OPINION

WINNER, Chief Judge.

Several motions remain to be ruled upon in these cases, and the preliminary ruling on the government's motion in limine must be expanded in accordance with the comments made in my order of June 1, 1979. I intend to rule on all undisposed of motions in this opinion, and, if counsel think I have inadvertently left any motions hanging, I ask that I be advised of the oversight immediately. I do not propose to again rule on the motions granted orally during the hearing.

Identical motions to dismiss have been filed for defendant DeWayne Ahrendy, et al (motion filed by Clifford J. Barnard) Rebecca Margolis (motion filed by Michael G. Katz) and Dan Chancellor (pro se). These motions urge, inter alia, that the applicable statute and regulations are impermissibly vague; that the statute constitutes an unlawful delegation of power to an administrative agency and that 10 C.F.R. § 860.3 was not in effect on April 29, 1979, the date the offenses are alleged to have occurred. Additionally, it is claimed that the prosecutions are unlawful because the FBI didn't investigate and because the Attorney General didn't personally authorize the prosecutions. Some defendants have joined in some or all of these motions, as well as in motions filed by other defendants, and all rulings are applicable to every defendant unless a defendant expressly asks that a motion not apply to him or to her.

Defendants Dixon, Lundberg, Workman and Wittig (motion filed by Daniel T. Carrillo) ask dismissal because of alleged unconstitutionality of the statute, and it is urged that the regulation which prohibits "unauthorized entry" is invalid because it doesn't spell out who can give "authorization." Additionally, it is claimed that there was improper delegation of authority to employees of a private contractor, and all of this is said to violate due process. These

same defendants ask dismissal because they say the information fails to charge a crime. This is so, say defendants, because of deficiencies in adopting the applicable rules and regulations. By separate motion these defendants ask dismissal because the FBI didn't investigate and because the Attorney General didn't personally authorize the prosecutions.

Defendant Krupnick filed a separate motion to dismiss (motion filed by Mitchell Benedict III) because the Attorney General didn't personally commence the prosecutions.

Three separate motions to dismiss were filed in behalf of defendant Fisk, et al (motions filed by Peter R. Bornstein). These motions raise most if not all of the grounds pleaded in the motions filed in behalf of other defendants.

In my judgment, decision on most of the motions does not require much discussion, and I think that the foregoing summary of the motions shows that many can be decided together on the basis of similarity or identity of questions raised. I start with a quotation of the important statutes and regulations.

42 U.S.C. § 2271 provides:

"(a) To protect against the unlawful dissemination of Restricted Data and to safeguard facilities, equipment, materials, and other property of the Commission, the President shall have authority to utilize the services of any Government agency to the extent he may deem necessary or desirable.

"(b) The Federal Bureau of Investigation of the Department of Justice shall investigate all alleged or suspected criminal violations of this chapter.

"(c) No action shall be brought against any individual or person for any violation under this chapter unless and until the Attorney General of the United States has advised the Commission with respect to such action and no such action shall be commenced except by the Attorney General of the United States: *Provided, however,* That no action shall be brought under section 2272, 2273, 2274, 2275, or 2276 of this title except by the express direction of the Attorney General: *And provided further,* That nothing in this subsection shall be construed as applying to administrative action taken by the Commission."

42 U.S.C. § 2278a provides:

"(a) The Commission is authorized to issue regulations relating to the entry upon or carrying, transporting, or otherwise introducing or causing to be introduced any dangerous weapon, explosive, or other dangerous instrument or material likely to produce substantial injury or damage to persons or property, into or upon any facility, installation, or real property subject to the jurisdiction, administration, or in the custody of the Commission. Every such regulation of the Commission shall be posted conspicuously at the location involved.

"(b) Whoever shall willfully violate any regulation of the Commission issued pursuant to subsection (a) of this section shall, upon conviction thereof, be punishable by a fine of not more than $1,000.

"(c) Whoever shall willfully violate any regulation of the Commission issued pursuant to subsection (a) of this section with respect to any installation or other property which is enclosed by a fence, wall, floor, roof, or other structural barrier shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not to exceed $5,000 or to imprisonment for not more than one year, or both."

Part 860 of 10 C.F.R. is entitled "Trespassing on Administration Property," and it says:

"§ 860.1 Purpose.

"The regulations in this part are issued for the protection and security of facilities, installations and real property subject to the jurisdiction or administration, or in the custody of, the Energy Research and Development Administration.

"§ 860.2 Scope.

"The regulations in this part apply to all facilities, installations and real property

38

subject to the jurisdiction or administration of the Energy Research and Development Administration or in its custody which have been posted with a notice of the prohibitions and penalties set forth in this part.

"§ 860.3 Trespass.

"Unauthorized entry upon any facility, installation or real property subject to this part is prohibited.

"§ 860.4 Unauthorized introduction of weapons or dangerous materials.

"Unauthorized carrying, transporting, or otherwise introducing or causing to be introduced any dangerous weapon, explosive, or other dangerous instrument or material likely to produce substantial injury or damage to persons or property, into or upon any facility, installation or real property subject to this part, is prohibited.

"§ 860.5 Violations and penalties.

"(a) Whoever willfully violates either § 860.3 or § 860.4 shall, upon conviction, be punishable by a fine of not more than $1,000.

"(b) Whoever willfully violates either § 860.3 or § 860.4 with respect to any facilities, installation or real property enclosed by a fence, wall, floor, roof, or other structural barrier shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not to exceed $5,000 or imprisonment for not more than one year, or both.

"§ 860.6 Posting.

"Notices stating the pertinent prohibitions of § 860.3 and § 860.4 and penalties of § 860.5 will be conspicuously posted at all entrances of each designated facility, installation or parcel of real property and at such intervals along the perimeter as will provide reasonable assurance of notice to persons about to enter.

"§ 860.7 Effective date of prohibition of designated locations.

"The prohibitions in §§ 860.3 and 860.4 shall take effect as to any facility, installation or real property on publication in the FEDERAL REGISTER of the notice designating the facility, installation or real property and posting in accordance with § 860.6.

"§ 860.8 Applicability of other laws.

"Nothing in this part shall be construed to affect the applicability of the provisions of State or other Federal laws."

■ With these prefatory quotations, I reach the more sweeping motions. I do not think that 42 U.S.C. § 2278a constitutes an unconstitutional delegation of authority. There is no absolute prohibition against delegation. *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263. Although there can't be delegation of the naked right to legislate, there can be delegation of the power to enforce legislation and to enlarge on defined standards if the statute contains reasonable guidance and reasonable definition of the standards to be used and the matters and subjects to be regulated. *Sunshine Anthracite Coal Co. v. Adkins, supra; Hampton v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624. Not since 1935, in *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, has the Supreme Court found an unlawful delegation of power. All that is required is that there be a delineation of policy, a designation of the agency to implement it and a statement of the outer boundaries of the delegated authority. 42 U.S.C. § 2278a easily meets these tests. It authorizes the Commission to issue regulations "relating to the entry upon . . . any facility, installation, or real property subject to the jurisdiction . . . of the Commission." It says that anyone violating any such regulation shall be guilty of a misdemeanor. There is no unlawful delegation of authority. 10 C.F.R. § 860.1 spells out the purpose of the regulations as the protection of the facilities under the jurisdiction of the Energy Research and Development Administration, and it says that "unauthorized entry upon any facility, installation, or real property subject to this part is prohibited."

■ This last quoted phrase leads to a separate attack on the prosecutions. Defendants argue that no one can be prose-

cuted because the regulation doesn't say who can "authorize" the entry. This is a self-defeating argument. For there to be claim made of "authorized" entry, it would be incumbent upon someone to show that there had been "authorization", and all the government has to do is to prove that no one exercising any lawful authority at Rocky Flats purported to "authorize" the trespass. Topping off the delegation arguments are claims that a private contractor took over for the government in restricting entry. The evidence does not establish this. The contractor and its security people worked with but always under the direction of the responsible officials of the Department of Energy. Of course, some operational decisions were [and they had to be] made by persons on the scene and in charge, but policies were set by the Department of Energy, and arrests were made . by the United States Marshal. Security was protected at Rocky Flats just as it is protected at all plants where Congress has elected not to provide the Federal Protection Service as plant guardians.

▮ All of this ties into an argument that the statute and the regulations are too vague to have legal effect, but I do not agree. I think that the defendants had full notice of what they were prohibited from doing, and the evidence at the motion hearing showed that public announcements were made explaining in detail what would happen to defendants if they crossed the line. [See, Exhibit 14] At the evidentiary hearing on the motions photographs were introduced showing that large, easily readable signs had been posted which clearly complied with the requirements of 10 C.F.R. § 860.6 and which gave every defendant personal notice that crossing the line would constitute a violation of the law subjecting him or her to a fine of $1,000.00. [See, Exhibits 7 and 8] The requirements of the law were not vague, uncertain nor unclear. All attacks on any such grounds fail.

▮ Dismissal of all cases is sought because there was no investigation of the alleged trespasses by the Federal Bureau of Investigation. This argument stems from the provisions of 42 U.S.C. § 2271, supra, which says that "[t]he Federal Bureau of Investigation . . . shall investigate all alleged or suspected criminal violations of this chapter." This is no more than a designation of the agency to conduct an investigation when an investigation is necessary. The statute gives the FBI investigatory jurisdiction, and that's all it does. It is not a requirement that something be investigated when no investigation is necessary. These alleged offenses are said to have been committed in the presence of United States Marshals who, along with an Assistant United States Attorney, are said to have seen and to have observed the commission of the offenses. The Federal Bureau of Investigation is not required to waste its time investigating matters which don't need any investigation. I reject any argument that the charges should be dismissed because of lack of F.B.I. investigation.

▮ No more do I accept the argument that dismissals are mandated because of a supposed violation of 42 U.S.C. § 2271(c) which says that "[n]o action shall be brought against any individual or person for any violation under this chapter unless and until the Attorney General of the United States has advised the Commission with respect to such action and no such action shall be commenced except by the Attorney General of the United States." These prosecutions were commenced by the office of the United States Attorney for the District of Colorado, and defendants say they must fail for that reason. The answers are several. A casual reading of the statutory history shows that what Congress had in mind was civil actions which might risk disclosure of vital intelligence. *Babcock & Wilcox Co. v. United Technologies Corp.*, D.C.Ohio, 435 F.Supp. 1249, explains the Congressional scheme. Congress cannot have intended that the Attorney General personally prosecute every trespass case on property under the control of the Department of Energy, and I refuse to reach any such ludicrous result. Moreover, in its technical sense, the word "action" has been held

**40**

to mean civil actions and not criminal prosecutions. *United States v. Cleveland,* D.C. Ala., 281 F. 249, 1 Am.Jur.2d Actions, § 4. To reach defendants' conclusion would require a holding that 28 U.S.C. § 547 was repealed by implication. That statute imposes on the United States Attorney the duty to "prosecute for all offenses against the United States" occurring in his or her district. See, *People v. Muka,* N.D.N.Y., 440 F.Supp. 33. It is hornbook law that repeals by implication are not favored, and they most certainly are not favored to bring about a totally absurd result. However, if this be not enough, out of an abundance of caution, the United States Attorney obtained a letter [Exhibit 15, evidentiary hearing on motions] from Charles F. C. Ruff, Associate Deputy Attorney General saying that in his capacity as Acting Deputy Attorney General, he directed prosecutions under 42 U.S.C. § 2278a, although he qualified his direction by saying:

> ". . . I do not believe that any such direction is required by the terms of Section 2271 of Title 42, which calls for the 'express direction of the Attorney General' only when action is to be taken under Sections 2272–2276."

I agree completely with Mr. Ruff's interpretation of the law, but if it be incorrect, it seems to me that the authorization was obtained. Needless to say, defendants argue that the Acting Deputy Attorney General's authorization isn't enough, and that Judge Bell must personally authorize each trespass case. I think that the Tenth Circuit has effectively decided this argument against defendants. *United States v. Smith,* 10 Cir. 532 F.2d 158.

■ Next we have a somewhat convoluted argument that the prohibition against trespassing on the land where the arrests were made was not validly adopted. Testimony at the motion hearing showed that the boundaries of Rocky Flats were extended, and the arrests were made in the enlarged area rather than at a spot within its original boundaries. The original notice concerning the illegality of trespass at Rocky Flats was published October 12, 1965,

in 30 C.F.R. 13289. It was amended as to description in 1967, at 32 C.F.R. 5382, and it was once more amended in 1975 in 40 C.F.R. 38187. On April 13, 1979, a notice was published amending the legal description, and then there was a further publication two weeks later which is to be found at 44 C.F.R. 24625. [A typist or a type setter used the participle "prohibiting" in place of "prohibit", but the meaning is there when read with the amended notices.] Thus, the last publication was only a few days before the arrests, and defendants say that the prohibition as to the enlarged area wasn't applicable because time for public comment hadn't run. The argument goes like this. 42 U.S.C. § 7191 makes the Administrative Procedure Act applicable to the Department of Energy, and § 7191(b) says that no rule, regulation nor order can become effective for 30 days after its publication. The 30 days is to allow for comment prior to promulgation of the rule or order. The offenses are alleged to have occurred just a few days after the publication, so, say defendants, as a pure syllogism, there was no violation. This argument has a certain amount of quick appeal, but the answer lies in the fact that the change in boundary wasn't the adoption of a rule or regulation which is entitled to comment. It was just a notice in furtherance of the existing regulation. This interpretation is supported by the language of 10 C.F.R. 860.7, which, as I read it, requires Federal Register publication only on initial selection of the operation as being one subject to the statute and regulations.

The initial authority for the prohibition is not one engineered by the Department of Energy; it is something Congress provided for in 42 U.S.C. § 2278a, and Congress effectively gave authority to make criminal any trespass prohibited by a Department of Energy regulation. The regulation which may be subject to 42 U.S.C. § 7191(b) is 10 C.F.R. Part 860, but no sentence of it is subject to the frailty of having an effective date within 30 days of promulgation. A change in the legal description of the property subject to the penalties of 42 U.S.C.

§ 2278a and 10 C.F.R. Part 860, is the giving of a notice and it is not the adoption of a rule within the meaning or intent of 42 U.S.C. § 7191. The informations are not subject to dismissal because notice of the expanded legal description wasn't published until April 13–26, 1979.

 Threading its way through defendants' motion is a veiled argument that because of these prosecutions, their First Amendment rights are being interfered with. As I look at it, this is not so. The defendants can speak out in support of their views and in opposition to the government's policies. The defendants can write and publish anything they want to. They can advocate and they can criticize. They can carry signs, sing songs, chant chants, give speeches and vocalize or participate in symbolic actions in any way they want to in full exercise of their First Amendment rights. Indeed, as shown during the evidentiary hearing, the Department of Energy roped off a 20-acre site with a gate specially cut into it to permit full expression of opposition to the nuclear policies of this country. The media reported that many thousands of persons took advantage of this guaranteed right to speak out, but the government says that about two percent of those numbered among the loyal opposition on April 28, 1979, on the next day chose to defy the warning they were given. There is no First Amendment right to commit criminal trespass. There is no First Amendment right to block public entry to either public or private property. Persons working or having business at Rocky Flats have a right to get to and from their jobs and to and from the plant without having their passage along a public way blocked by demonstrators. On public roads outside of the designated area, ideas can be communicated in any reasonable way, but it is not reasonable to block traffic nor to march across a well defined, clearly posted line after being told the consequences. The First Amendment doesn't guarantee someone a right to break the criminal law. Freedom of expression doesn't mean freedom to make, ignore or violate the criminal law.

With this, then, I think that all pending motions of defendants are disposed of. At the time of the hearing, I granted all motions by defendants to join in motions filed by any other defendant, and I extended the time minimally for the filing of voir dire questions and tendered instructions. Also, as to counsel who had just been appointed, I extended until June 8, 1979, the time within which they can file any other motions if they think additional motions are necessary, and I asked that they make every effort to improve on the June 8, 1979, date. Except for the few non-dispositive motions orally granted at the hearing on May 31, 1979, all motions filed by defendants are denied.

This brings me, then to the prosecution's motion in limine seeking an advance ruling on evidentiary questions. On May 13, 1979, I gave counsel an order containing a capsulized tentative ruling on the government's motion, and I explained at that time that I did so to afford more time for counsels' preparation of written offers of proof and to allow more time for counsel to plan trial strategy. I said that I would expand on this order, and I shall do so now.

I repeat that these are criminal cases in which a jury will be asked to decide whether the government has proven the charge made beyond a reasonable doubt; i. e., the charge of criminal trespass; and that is all any jury will pass on. There will be no jury trial as to the morality or immorality of nuclear weapons or nuclear power. There will be no jury trial as to the wisdom or lack of wisdom of continuing any part of the nuclear program in this country. No jury will decide on the correctness *vel non* of any acts of Congress or the executive branch of the government. These are not decisions to be made by either judge or jury. There will be no jury trial involving the good or bad motives of any defendant. No jury will be asked to decide any political question, nor will a jury pass on the relevance or materiality of any defense.

The question of admissibility of proffered evidence is one to be answered by the court, and, although the subject matter is totally

different, the flurry of cases dealing with admissibility of co-conspirators statements apply principles which I think are here controlling. See, *United States v. Andrews*, 10 Cir. (1978) 585 F.2d 961; *United States v. Enright*, 6 Cir. (1978) 579 F.2d 980; *United States v. James*, 5 Cir. (1978) 576 F.2d 1121; *United States v. James (en banc)* 5 Cir. (1979) 590 F.2d 575 and cases cited therein. As these cases discuss, admissibility is something covered by Rule 104, and it is a question for the trial judge. Applying the principles of Rule 104 as discussed, for example in the first *United States v. James, supra,* the admissibility of certain proffered testimony may call for application of Rule 104(a) and (b), and, possibly, Rule 104(c) may come into play. So it is that written offers of proof have been ordered to avoid possible need for recesses for hearings out of the presence of the jury. The offers of proof will be considered by the court insofar as may be appropriate in passing upon the admissibility of any testimony claimed to support any available defense, but the evidence itself will not be presented to a jury until the preliminary ruling is made by the trial judge. As is true with all offers of proof, each should give the name or names of the witnesses and a reasonable summary of the detailed evidence which is being offered. Anything less would not afford a fair basis for the evidentiary ruling nor for an adequate review by an appellate court.

In my order of May 31, 1979, I said that the principles and rules of certain listed cases would govern the admissibility of evidence, and, therefore, those cases should be examined in some detail. Using sundry approaches, defendants say that they were forced to trespass because of some overpowering force which mandated their violation of the criminal law. This argument has come before the courts in all sizes, shapes, colors and descriptions, and it has not fared well. It once was advanced by the master of a schooner trying to run the Union blockade during the civil war, but, speaking for a unanimous Supreme Court, Mr. Justice Field said:

"It is undoubtedly true that a vessel may be in such distress as to justify her in attempting to enter a blockaded port. She may be out of provisions or water, or she may be in a leaking condition, and no other port be of easy access. The case, however, must be one of absolute and uncontrollable necessity; and this must be established beyond reasonable doubt. 'Nothing less', said Sir William Scott, 'than an uncontrollable necessity, which admits of no compromise, and cannot be resisted,' will be held a justification of the offense. Any rule less stringent than this would open the door to all sorts of fraud. Attempted evasions of the blockade would be excused upon pretences of distress and danger, not warranted by the facts, but the falsity of which it would be difficult to expose." *The Diana*, 7 Wall. 354, 19 L.Ed. 165.

*The Diana* was a civil case, and I don't think its statement about the burden of proving an affirmative defense is applicable to the criminal law, but I do think that it gives fair introduction to the very narrow limits of various defenses relying upon a compulsion claimed to require the performance of an act defendants urge should take precedence over a criminal law prohibiting that same act.

The Viet Nam war is the event which brought about the recent decisions passing upon the availability of defenses such as the defense of "necessity," "justification," "choice of evils," or similar explanations attempting to explain away criminal acts. *United States v. Cullen* (1971) 7 Cir., 454 F.2d 386, was such a case, and John Paul Stevens was the author of the opinion. The defendant was convicted of burning Selective Service records, and the trial judge let him testify to extended moral and religious "justifications," for his conduct. It was held that the testimony was not relevant and should not have been received. The opinion then passes to a discussion of the type of intent which has to be proved in offenses such as these. The instruction as to the term "willful" was expressly approved, and that instruction was:

"The word 'wilfully,' as used in the crimes charged, means the act was com-

mitted by the defendant voluntarily with knowledge that it was prohibited by law and with the purpose of violating the law and not by mistake or accident."

Because of the importance of the case, and because it is one of the cases which will govern these trials, I quote from it at some length:

"The trial judge instructed the jury that the Government was obliged to prove all of the elements of both offenses, including specific intent, which he defined as more than a mere intent to commit an act but as also including a deliberate purpose to violate the law. He carefully differentiated between motive and intent:

'Intent and motive should never be confused. Motive is what prompts a person to act. Intent refers only to the state of mind with which the act is done. Good motive alone is never a defense where the act done is a crime. One may not commit a crime and be excused from criminal liability because he desired or expected that ultimate good would result from his criminal act. Moreover, if one commits a crime under the belief, however sincere, that his conduct was religiously, politically or morally required, that is no defense to the commission of a crime.'

"The instructions proposed by appellant, which the district court refused to give, are exemplified by the following:

'You are instructed that it is Michael Cullen's theory of defense that his religious beliefs compelled him to commit the acts with which he is charged, and that on September 24, 1968, he had no choice but to act as he did.

'If the evidence you have heard upon this trial in support of this compulsion creates in your mind a reasonable doubt whether Michael Cullen had the specific criminal intent to commit these acts, then, as a matter of law, you must find the defendant not guilty.'

"Relying on *United States v. Vole,* 435 F.2d 774 (7th Cir. 1970), appellant contends that he was entitled to have the court explain his theory of defense to the jury. But as *Vole* plainly states, he has no such right unless his theory has both legal and evidentiary support. See 435 F.2d at 776–777. In this case, appellant's evidence does not support any acceptable legal theory."

There is then an extended discussion of the type of intent which need be proven, and it was said that insofar as the requirement in most cases that there be a "consciousness of wrongdoing," is concerned, statutory offenses such as this may be committed absent that element. *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, is distinguished on this ground.

The opinion concludes:

"In a case such as this, if the proof discloses that the prohibited act was voluntary, and that the defendant actually knew, or reasonably should have known, that it was a public wrong, the burden of proving the requisite intent has been met; proof of motive, good or bad, has no relevance to that issue.

"If defendant's theory of defense were valid, the character of his conduct would be judged not by the rule of law but by the end which his means were designed to serve. His theory is merely another variety of an age-old argument. If a religious, moral, or political purpose may exculpate illegal behavior, one might commit bigamy to avoid eternal damnation; [16]

"[16] 'To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.' *Reynolds v. United States,* 98 U.S. 145, 167, 25 L.Ed. 244.

steal from the rich to give alms to the poor; burn and destroy, not merely public records or perhaps buildings but even public servants as well, to implement a Utopian design.

"One who elects to serve mankind by taking the law into his own hands thereby demonstrates his conviction that his own ability to determine policy is superior to democratic decision making.[17] Ap-

"[17] An unselfish motive affords no assurance that a crime will produce the result its perpe-

trator intends. After the assassination of Jean Paul Marat in July 1793, Charlotte Corday wrote: '. . . I confess I made use of a treacherous trick to induce him to receive me; but in such circumstances the end justifies the means . . . . But if one saves one's country one must not think of the price that has to be paid. May Peace be established as quickly as I hope it will be. A great step has been taken in that direction without which we never should have had it . . . .' (As translated by Stanley Loomis at p. 138 of Paris in the Terror, June 1793—July 1794.) The events which ensued proceeded in precisely the opposite direction from that intended or expected by Mlle. Corday.

pellant's professed unselfish motivation, rather than a justification, actually identifies a form of arrogance which organized society cannot tolerate.

"A simple rule, reiterated by a peaceloving scholar, amply refutes appellant's arrogant theory of defense: 'No man or group is above the law.' [18]

"[18] *United States v. United Mine Workers,* 330 U.S. 258, Rutledge, J., dissenting at p. 343 and again at p. 385, 67 S.Ct. 677, at pp. 720, 741, 91 L.Ed. 884.

"The judgment is affirmed."

Speaking for the Fourth Circuit, Judge Sobeloff said in *United States v. Moylan* (1969) 417 F.2d 1002 (another mutilation of draft records case) that the only intent the government need prove "is the intent on the part of the accused to commit the proscribed acts with knowledge that they were violating the statute." The trial judge so instructed, and Judge Sobeloff continued:

"(Defendants) position was and is that since they acted from good motives, i. e., to protest a war which they sincerely believed was not only illegal but immoral, they could not have 'willfully' violated the statutes and must be acquitted. We agree with the interpretation of the trial judge. . . . The statutory requirement of willfulness is satisfied if the accused acted intentionally, with knowledge that he was breaching the statute. . . (W)hatever motive may have led them to do the act is not relevant to the question of the violation of the statute . . . ."

Defendants in *Moylan* wanted the jury to pass on questions of law as well as on questions of fact, but this request was rejected with an interesting discussion of American judicial history, and it was said:

"The Supreme Court, in the landmark case of *Sparf and Hansen v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895), affirmed the right and duty of the judge to instruct on the law, and since that case the issue has been settled for three-quarters of a century."

Judge Sobeloff concludes:

"As an undercurrent throughout the trial and interwoven with appellants' assertions of error is an appeal to morality as justification for their conduct. The argument consists of two closely related strands. They argue that the motivation for their action was moral in the sense that they intended to protest a war which is outrageous to their individual standards of humanity. Therefore, their actions are said to be not punishable regardless of the literal violation of a statute. Moreover, appellants argue that apart from their motivation, which is subjective, the war in Vietnam is in fact illegal and immoral and hence their acts in protest of this war were themselves moral acts for which they must be similarly immunized from punishment. In effect, the appellants focus upon the means by which an organized society treats those citizens who choose to commit an act of civil disobedience in the name of justice.

"From the earliest times when man chose to guide his relations with fellow men by allegiance to the rule of law rather than force, he has been faced with the problem how best to deal with the individual in society who through moral conviction concluded that a law with which he was confronted was unjust and therefore must not be followed. Faced with the stark reality of injustice, men of sensitive conscience and great intellect have sometimes found only one morally justified path, and that path led them inevitably into conflict with established authority and its laws. *Among philosophers and religionists throughout the ages there has been an incessant stream of discussion as to when, if at all, civil disobedience,*

*whether by passive refusal to obey a law or by its active breach, is morally justified. However, they have been in general agreement that while in restricted circumstances a morally motivated act contrary to law may be ethically justified, the action must be non-violent and the actor must accept the penalty for his action. In other words, it is commonly conceded that the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law.*[21]

"[21] Adherents and practitioners of civil disobedience who have reached this conclusion are too many to list. One need only allude to Socrates, Sir Thomas More, Henry David Thoreau, Gandhi, and Martin Luther King, Jr. whose actions supported this proposition. The Lutheran and Episcopal Churches in America have endorsed civil disobedience, but only if action is non-violent and the actor is willing to accept the consequences of his action. See, Lutheran Church in America, Statement of Race Relations, July 9, 1964 (adopted by the 1964 convention of the church in Pittsburgh, Penna.); Episcopal Church, Report No. 5 on Christian Social Relations (adopted by the 1964 General Convention of the Church in St. Louis, Missouri).

*"The defendants' motivation in the instant case—the fact that they engaged in a protest in the sincere belief that they were breaking the law in a good cause—cannot be acceptable legal defense or justification.* Their sincerity is beyond question. It implies no disparagement of their idealism to say that society will not tolerate the means they chose to register their opposition to the war. If these defendants were to be absolved from guilt because of their moral certainty that the war in Vietnam is wrong, would not others who might commit breaches of the law to demonstrate their sincere belief that the country is not prosecuting the war vigorously enough be entitled to acquittal? Both must answer for their acts. "We are not called upon in this case to establish guidelines for determining in what extreme circumstances, if any, governmental acts may be resisted. We confine ourselves to this case and hold only that the law does not allow the seizure of public records and their mutilation or destruction, even when this is done as an act of conscience to dramatize the protest of a presumed evil. The acts of these appellants are not as extreme as some committed by other dissenters. Nevertheless, this publicly exploited action cannot be dismissed as *de minimis*. *To encourage individuals to make their own determinations as to which laws they will obey and which they will permit themselves as a matter of conscience to disobey is to invite chaos.* No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable. Toleration of such conduct would not be democratic, as appellants claim, but inevitably anarchic." [Emphasis supplied.]

*United States v. Simpson* (1972) 9 Cir. 460 F.2d 515, was another Viet Nam war case, and it narrowly limits the scope of a justification defense. Comment is made that the age-old instances of "justification" are the defenses of self defense, defense of property and prevention of a crime being committed in the person's presence. However, the case holds that these latter defenses can't be distorted to fit objection to government policies because "[a]n essential element of the so-called justification defenses is that a direct causal relationship be reasonably anticipated to exist between the defender's action and the avoidance of harm." The court then said, "[i]t was unreasonable for Simpson to assume that any violent action he initiated might have any significant effect upon the supposed ills that he hoped to remedy." The footnote pointed out that the Viet Nam War would have continued "whether or not the San Jose, California draft board was able to restore its files and continue its lawful operation", and, unless an offer of proof demonstrates to the contrary, it seems likely that this country's nuclear program could not be stopped as a result of blocking entry to Rocky Flats. In *Simpson*, the Ninth Circuit adopted the reasoning of *Moylan, supra*, as to the type of intent and the nature of wilfullness which is required, just as it rejected the conten-

tion that questions of law should be for a jury.

A state court case discussing these problems is *Hawaii v. Marley* (1973) 54 Haw. 450, 509 P.2d 1095, a very well written opinion of the Supreme Court of Hawaii. The opinion is deserving of thoughtful study, and I first quote only from parts of the syllabus written by the court. The cases were for criminal trespass because defendants entered the premises of the Honeywell Corporation which was engaged in certain war related activities. The typical justification, necessity and choice of evil defenses were advanced and rejected by the court with a full discussion of the law's requirements which were summarized in the syllabus:

"10. The prevention or termination of a crime is a justification defense for criminal conduct only when the crime to be prevented or terminated occurs in the 'presence' of defendant, regardless of the type of conduct, or degree of violence therein, that defendant seeks to excuse.

"11. The 'presence' requirement in the justification defense of prevention or termination of a crime is not satisfied by information about said crime received through media dissemination.

. . . . .

"13. Successful use of the 'necessity defense' requires (a) that there is no third and legal alternative available, (b) that the harm to be prevented be imminent, and (c) that a direct, causal relationship be reasonably anticipated to exist between defendant's action and the avoidance of harm.

"14. The Nuremberg defenses are not available to those whose personal rights have not been violated, nor to those not subject to prosecution under the principles of the Nuremberg trials."

In the body of the opinion in *Marley* the court said:

"Defendants appear to argue that they should be exonerated for criminal trespass for another reason. They claim that the 'necessity defense' applies to their actions. It is evident that defendants misunderstand the defense.

"The 'necessity defense', which is another of the justification defenses, has sometimes been called the 'choice of evils' defense. The latter phrase is very descriptive of the defense, yet fails to include, even by implication, all of its elements. Several of the crucial elements of the 'necessity' or 'choice of evils' defense are absent from this case, and thus it is impossible for defendants to rely on the defense to exonerate them.

"In essence, the 'necessity' defense exonerates persons who commit a crime under the 'pressure of circumstances', if the harm that would have resulted from compliance with the law would have significantly exceeded the harm actually resulting from the defendants' breach of the law. The defense is not effective in the following situations:

"(1) Where there is a third alternative available to defendants that does not involve violation of the law, defendants are not justified in violating the law. LaFave and Scott, Criminal Law, p. 387; *Bice v. State*, 109 Ga. 117, 120, 34 S.E. 202, 203 (1899); *United States v. Holmes*, 26 F.Cas. 360, 367 (No. 15,383) (C.C.Pa. 1842). Other forms of noncriminal protest were and are available to defendants to enable them to dramatize, and hence hopefully terminate, conduct which they may view are harmful.

"(2) A closely related required element is that the harm to be prevented be imminent. Where, as here, the harmful acts to be prevented by defendants' actions were, at best, only tenuously connected with the situs of the crime, and would be only tenuously affected by defendants' acts, we cannot find any real 'necessity' for defendants to act.

"(3) Thirdly, and most importantly, even assuming *arguendo* that alternative courses of action were 'unavailable' (perhaps because ineffective) or that there was some strong connection between the Honeywell office in Honolulu and the allegedly criminal acts that defendants sought to prevent, such connection being

significant enough to establish the requisite degree of immediacy or imminence of the greater harm to be prevented, defendants remain unentitled to the defense of 'necessity' because their actions were not reasonably designed to actually prevent the threatened greater harm. In *United States v. Simpson*, 460 F.2d 515, 518 (9th Cir. 1972), the court stated: 'An essential element of the so-called justification defenses is that a direct causal relationship be reasonably anticipated to exist between the defender's action and the avoidance of harm'. Under any possible set of hypotheses, defendants could foresee that their actions would fail to halt Honeywell's production of the war material, the production of which defendants assert to be a war crime. Since no reasonable man could find otherwise, it was not error for the judge to have omitted an instruction on the 'necessity defense'."

I think that *Marley* fairly and correctly states the law which must be applied to the trial of a case such as this.

It should not be necessary to say that no Colorado criminal statute has any applicability to a trial in the federal court, but in passing I mention C.R.S. '73, 18–1–702 which appears under the chapter entitled "Justification and Exemptions from Criminal Responsibility." That statute is really no more than a codification of the common law on "justification defenses", and it says:

"18–1–702. Choice of evils. (1) Unless inconsistent with other provisions of section 18–1–703 to 18–1–707, defining justifiable use of physical force, or with some other provision of law, conduct which would otherwise constitute an offense is justifiable and not criminal when it is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no conduct of the actor, and which is of sufficient gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweigh the desir-

ability of avoiding the injury sought to be prevented by the statute defining the offense in issue.

"(2) *The necessity and justifiability of conduct under subsection (1) of this section shall not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder. When evidence relating to the defense of justification under this section is offered by the defendant, before it is submitted for the consideration of the jury, the court shall first rule as a matter of law whether the claimed facts and circumstances would, if established, constitute a justification."* [emphasis supplied.]

I think that the italicized subsection of the Colorado statute does nothing but emphasize that "morality" or "advisability" of a statute are not things to be tried to a jury and, importantly, it says that the preliminary determination of admissibility of evidence is something which must be decided by the court rather than by a jury. With the preface that the statute is a codification of the common law, Judge Sternberg said in *People v. Robertson (1975) 36 Colo.App. 367, 543 P.2d 533:*

"For this defense to be available here, it must first be shown that defendant's conduct was necessitated by a specific and imminent threat of injury to his person under circumstances which left him no viable alternative other than the violation of the law for which he stands charged."

On the facts of that case, I think the statement of the law is correct, but I doubt that there is any requirement in all instances of the precise threat discussed by the Colorado Court of Appeals. Undeniably, though, the conditions precedent to the exercise of such a defense which have been discussed in the cases quoted earlier in this opinion must be established before any such testimony can be heard by a jury. That is why the written offers of proof must be detailed and specific as to the evidence which will permit one of these vary narrow defenses.

It was my understanding at time of oral argument that there is no contemplated defense of coercion in the accepted sense of that word. I said then, and I repeat now, that should such a defense be advanced, *Shannon v. United States, 10 Cir. (1935) 76 F.2d 490, and* Devitt and Blackmar *§ 14.16* will control.

I have talked repeatedly about written offers of proof, and I have explained the reasons for requesting that the offers be in writing. However, I said at the time of oral argument, I do not demand the impossible. I ask that written offers be made as to all proffered evidence which counsel think stands a fair chance of being excluded under the rules set out in this opinion. Of course, if something comes up at time of trial which, in the exercise of reasonable trial preparation cannot be anticipated, oral, narrative offers of proof can be made, but there is slight chance that permission will be granted for a question and answer offer of proof even though it be outside the presence of the jury.

■ Let me summarize, then, some of the things I have said:—

1. No evidence will be received offered to prove either the morality or immorality of nuclear weapons or nuclear power.

2. No evidence will be received offered to establish good or bad motive on the part of defendants.

3. No evidence will be received offered in support of or in opposition to the wisdom of any political question or any government policy.

4. No evidence will be received offered to show the correctness or incorrectness of or the advisability or inadvisability of any legislative act or any executive action insofar as that evidence is offered in support of any type of justification defense as that phrase is explained in the body of this opinion or in the cases referred to in this opinion.

5. No evidence will be received in support of any argument that actions were taken or that the law was defied because of an individual's belief that he had a right to determine governmental policy.

6. No evidence of religious belief offered as a defense to this criminal charge will be received.

7. Unless the offer of proof meets the very narrow limits of justification defenses, evidence in support of those defenses will not be received. Whether the offers meet this standard is something which will be decided by the court and not by the jury. Among other things, the proffered evidence will have to show:

1. A direct causal relationship between the defendant's actions and the avoidance of the perceived harm. This includes a showing that a reasonable man would think that blocking entry to Rocky Flats for one day would terminate the official policy of the United States government as to nuclear weapons or nuclear power.

2. The act to be prevented by defendant's conduct was criminal under the laws of the United States. A defendant's belief that the government approved conduct violated some religious or moral code is not sufficient.

3. The alleged criminal act which defendants wanted to stop was one occurring in their presence, and was one which would subject them to immediate harm which a reasonable man would think could be eliminated by defendants' conduct. [*See, Hawaii v. Marley*, 54 Haw. 450, 509 P.2d 1095, 1108.] In the words of that case:

> "To rule that a full justification defense to the prosecution for commission of crime is established even absent a presence requirement would be to create a very dangerous precedent, for it would make each citizen a judge of the criminality of all the acts of every other citizen, with power to mete out sentence."

4. There was no alternative available to defendants to accomplish their purpose which did not involve a violation of the law. If there were forms of non-criminal protest available, "to enable them to dramatize, and hence hopefully terminate," the nuclear program of the United

States, the prerequisites to a necessity defense aren't there.

Absent these things, and absent the full preliminary proof required in the cases I have cited, there is no room in these cases for a justification defense of any sort, be it choice of evils, necessity or something similar masquerading under another name. Unless there be an appropriate offer of proof, there will be no jury voir dire, there will be no opening statement, there will be no testimony, there will be no instructions and there will be no final argument as to a justification defense. Unless these strict requirements can be met, the cases will be tried for jury determination of whether defendants intentionally and wilfully trespassed on Rocky Flats property in violation of applicable federal law. "Intent" and "wilfullness" will be defined for the jury in accordance with this opinion, and the jurors can decide defendants' guilt or innocence.

I am authorized to say that the other active judges of this court have reviewed this opinion, and that the ground rules announced in it will be applied by them in all of these criminal cases.