471 A.2d 462

COMMONWEALTH of Pennsylvania

v.

Patricia Ann CAPITOLO, Appellant.

COMMONWEALTH of Pennsylvania

v.

Curtis Jay SELL, Appellant.

COMMONWEALTH of Pennsylvania

v.

Stephen E. ANDERSON, Appellant.

COMMONWEALTH of Pennsylvania

v.

Edward S. WAGNER, Appellant.

COMMONWEALTH of Pennsylvania

v.

Sue HEILMAN, Appellant.

Superior Court of Pennsylvania.

Argued May 10, 1983.

Filed Jan. 13, 1984.

Petition for Allowance of Appeal Granted May 1, 1984.

64

Jon Stuart Pushinsky, Pittsburgh, for appellants.

Craig E. Wynn, Assistant District Attorney, Beaver, for Com., appellee.

Before CERCONE, President Judge, and SPAETH, HESTER, BROSKY, WIEAND, BECK and JOHNSON, JJ.

SPAETH, Judge:

These appeals are from judgments of sentence for criminal trespass. Appellants' convictions arise from an incident that occurred during a demonstration against nuclear power at the Shippingport Nuclear Power Plant. Appellants argue that the trial court should have permitted them to prove that their conduct was justified under Section 503 of the Crimes Code. We agree and therefore vacate the

judgments of sentence and remand for a new trial at which appellants shall be permitted to prove, if they can, that their conduct was justified.

We have divided our discussion explaining this conclusion into four parts. These may be summarized as follows.

First: Appellants offered to prove that their conduct met the requirements of the defense of justification as defined in Section 503(a) of the Crimes Code, specifically, that they reasonably believed their conduct "to be necessary to avoid a harm or evil," and that "the harm or evil sought to be avoided by [their] conduct [was] greater than that sought to be prevented by the law defining [their conduct as criminal trespass]." 18 Pa.C.S.A. § 503(a). The trial court rejected appellants' offer. In doing so the court made plain its belief that even if appellants had been permitted to present their evidence, they would not have been able to prove that their trespass was justified. Perhaps so. But the jury should have been allowed to appraise appellants' evidence.

Second: In its opinion dismissing appellants' post-verdict motions the trial court read into Section 503(a) requirements that it considered were requirements of the common law defense of necessity. We do not find the common law clear. But in any event, the common law should not be read into Section 503(a), for to do so violates the principle that a criminal statute is to be narrowly construed, in favor of the accused.

Third: The trial court also rejected appellants' offer of proof on the ground that Section 503(a) has been preempted by federal and state legislation regulating nuclear power. We hold, however, that there has been no preemption.

Finally: We have discussed Section 510 of the Crimes Code. Appellants have not claimed, nor has the Commonwealth argued that they should have claimed, the defense of justification provided in Section 510. Nevertheless, we believe that appellants had to meet the requirements of Section 510, and we therefore discuss it. We conclude that

appellants' offer of proof did meet the requirements of Section 510, as well as those of Section 503.

1

On July 15, 1979, appellants participated in a protest against the generation of nuclear power at the Shippingport Nuclear Power Plant. Ignoring a "No Trespass" sign, appellants crept under a fence surrounding the property and sat down, holding hands, about ten to twelve feet from the fence. N.T. 45–48, 51. When a plant security guard and a deputy sheriff warned appellants that they were trespassing on private property, they refused to leave. N.T. 48, 52. The sheriff then placed appellants under arrest and removed them from the property; they did not resist, and were not charged with resisting their arrest. N.T. 52–53. No personal injuries or property damage occurred as a result of appellants' trespass. N.T. 49. At the time of the demonstration, the nuclear power unit at the plant was shut down, although radio-active material remained in its fuel rods. N.T. 57, 58. The unit was scheduled to resume operations in two weeks. N.T. 58. A second unit was under construction. N.T. 57.

In defending themselves against charges of criminal trespass, appellants relied on Section 503 of the Crimes Code, which provides:

(a) **General rule.**—Conduct which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable if:

(1) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;

(2) neither this title nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

(b) **Choice of evils.**—When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for

his conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

18 Pa.C.S.A. § 503.

This section is an almost exact copy of Section 3.02 of the Model Penal Code. In their Comment, the authors of the Code say that Section 3.02 "accepts the view that a principle of necessity, properly conceived, affords a general justification for conduct that otherwise would constitute an offense; and that such a qualification, like the requirements of culpability, is essential to the rationality and justice of all penal provisions." American Law Institute, Model Penal Code § 3.02 Comment at 5 (Tent. Draft No. 8, 1958).

The defense of justification is thus closely related to the common law defense of necessity, regarding which it has been said: "By necessity is meant the assertion that conduct promotes some higher value than the value of literal compliance with the law." G. Williams, The Criminal Law § 229 (2d ed. 1970). Thus, the concepts of "justification" and "necessity" reflect a judgment on the proper relationship between the state, with its power to declare conduct criminal, and the freedom of the individual. In an early New Jersey case the defense of necessity is described as

a natural right, not appertaining to sovereignty but to individuals considered as individuals. It is a natural right of which government cannot deprive the citizen and founded upon necessity and not expediency. It may be exercised by a single individual for his own personal safety or security, or for the preservation of his own property, or by a community of individuals in defense of their common safety or in the protection of their common rights. It is essentially a private and not a public or official right. It is a right not susceptible of any very precise definition, for the mode and manner and the extent of its exercise must depend on the nature and degree of the necessity that calls it into action, and this

cannot be determined until the necessity is made to appear.

*Hale v. Lawrence,* 21 N.J.L. 714 (1848), *aff'd sub nom. American Print Works v. Lawrence,* 23 N.J.L. 590 (1851).

Section 501 of the Crimes Code defines "believes" as meaning "reasonably believes." 18 Pa.C.S.A. § 501. Accordingly, under Section 503(a)(1) appellants were required to prove that they reasonably believed their trespass "to be necessary to avoid a harm or evil to [them] or to another," and that "the harm or evil sought to be avoided by [their trespass] [was] greater than that sought to be prevented by the law defining [their trespass as criminal trespass]."

To meet this burden, appellants filed a pre-trial statement entitled "Defendants' Memorandum of Points and Authorities in Support of Their Right to Present Evidence Relative to the Defense of Justification as Defined in 18 C.P.S.A. section 503." The memorandum contained an offer of proof, divided into two parts. The first part of the offer of proof summarized appellants' evidence "that they had a reasonable belief that their conduct was necessary to avoid the harm." Appellants offered to "present testimony and documentary evidence detailing the many and varied activities aimed at shutting down the Shippingport Nuclear Power Plant or eliminating the danger emanating from the plant." They offered to "show that these efforts have been without result," and "that even though 'official channels' may still exist which might theoretically remove the threatened danger[,] these avenues offer no real likelihood of achieving results." Finally, appellants offered to prove "a nexus between their conduct and the avoiding of the threatened harm" by showing that a decision to halt construction of a nuclear power plant in another state "came after the arrest of numerous demonstrators." The second part of the offer of proof summarized appellants' evidence "that the harm emanating from the Shippingport Nuclear Power Plant is far greater than any harm resulting from their trespass on the plant site." Appellants offered to prove

"the continuous risk of a serious accident ... far greater than the official estimates would indicate and that the consequences of such an accident would be much more severe than predicted by official studies .... [This evidence would include] 'incident reports' and other documentary evidence *specifically* concerning the Shippingport Plant." (Emphasis in original.) Appellants also offered to prove through expert testimony and "documentary evidence *specifically* concerning the Shippingport Plant" (emphasis in original) that in normal day-to-day operations the plant continuously releases "low level radiation [that] has already resulted in increased infant mortality and birth defects as well as increased incidence of cancer in adults." [1]

1. In his dissent Judge JOHNSON apparently opposes our reference to the offers of proof made in appellants' pretrial memorandum. Dissenting op. at 481, *et seq.* The dissent fails to note, however, that at a pretrial hearing immediately prior to the commencement of trial on November 29, 1979, legal argument was had on the memorandum and the Commonwealth's response to it. N.T. 1–9. After the jury was selected defense counsel requested a side bar conference at which the trial court denied the defense of justification. N.T. 40. At the close of the Commonwealth's case, and while the jury was in recess, appellants' counsel made an oral offer of proof to the same effect as the offer they had made in their pre-trial memorandum. N.T. 60–78. The next day, prior to the court's ruling on the offer, counsel submitted in addition a two-page document entitled "Defendants' Offers of Proof," listing nine points on which appellants planned to present evidence in support of their justification defense, as follows:

 1. Hydrogen bubble generation in Pressurized Water Reactor creates danger of radiation release from containment vessel and consequent radiation damage to life in this area.
 2. That low level radiation poses to defendants an immediate and continuing likelihood of cancerous illness to themselves and their families.
 3. That low level radiation poses to defendants and others an immediate and continuing risk of birth defects and genetic deformities.
 4. That the absence of an evacuation plan for Beaver County to meet Nuclear Regulatory Commission regulations, places handicapped and disabled persons in unavoidable danger.
 5. That efforts before public boards and agencies are ineffective and have been exhausted with regard to the operating nuclear power plants at Shippingport.
 6. That storage and transportation of nuclear wastes in and through this jurisdiction places your defendants and the public in immediate danger of irradiation.

The trial court rejected appellants' offer of proof, and limited appellants' evidence to their own testimony of their reasons for committing the trespass. Appellant Anderson testified that he feared "a catastrophic accident at Shippingport" and was concerned about the health of the community, which he believed was jeopardized by the power plant. N.T. 84–85. Appellant Sell testified that on the basis of his own research he believed that continued operation of the plant posed a danger because the reactor is of the same design as the Three Mile Island reactor. He also stated his view that an adequate evacuation plan is not in place in Beaver County in the event of an accident like the one that occurred at Three Mile Island. N.T. 88. Appellant Capitolo testified, also on the basis of personal research, that the numerous radiation leakages documented in public records had led her to conclude that nuclear reactors do not adequately contain radiation. N.T. 92–93. Vincent J.P. Scotti, who was one of the defendants below but who has not appealed his conviction, expressed concern that persons institutionalized in hospitals, old peoples' homes, and prisons would have nowhere to go in the event of an accident at the power plant requiring an evacuation. N.T. 99. He also stated:

7. That the Nuclear Regulatory Commission has ordered a freeze on nuclear plant construction and operating licenses.

8. That design defects common to all Pressurized Water Reactors present an immediate threat to your defendants of deadly and irreparable harm from a radiation release.

9. That protests as engaged in by your defendants have been and are effective in reducing the hazards of nuclear plants.

In addition, the offer listed the documentary evidence that appellants planned to introduce on the following points: (1) the "hazards of 'normal' plant operation;" (2) the "hazards of 'abnormal' plant operation;" (3) "the effectiveness of institutional measures to mitigate above hazards before regulatory and legislative bodies;" (4) "inadequacy and risk of current evacuation 'plans;'" and (5) "[a] recent Nuclear Regulatory Commission order for freeze on nuclear plant construction and operation." The offer was made part of the record at N.T. 82–83. This being the case, and since appellants' offer to prove justification was denied by the trial court twice on the record—once after argument on the pretrial memorandum, and a second time after appellants made written offers to proof—we are unable to agree with the dissent's view that appellants have failed to preserve the justification defense for appeal.

The reason why we went under the fence was not in any way to attempt to take over the nuclear power station, but it was a nonviolent counterpresence to the violent presence of the nuclear power plant. All we simply hoped to accomplish ... was to draw attention to the issue of nuclear power. Now, of course that might seem ridiculous. What is [*sic*] six people going under a fence going to do? I put forth to you: What are a bunch of Americans throwing tea into the Boston Harbor going to do? Again, this was a nonviolent demonstration.

N.T. 98.

Appellant Heilman, a nurses' aide, cited studies she had read on the infant mortality rate in the area, noting that a relationship between infant mortality and low level radiation had been found. She stated: "I just really feel strongly that as a person in the health field I have to practice preventative medicine which means environmentally and personally helping people do things to their bodies that will keep them healthy. I personally see nuclear power as a threat to our health." N.T. 101. Appellant Wagner stated that he trespassed "first off, [ ] for my family, my parents, my younger brothers and sisters, for they drink the water from ... the Ambridge Reservoir. Ambridge Reservoir is three and a half miles downwind from Shippingport, and I know from documented cases made public that Shippingport has released radiation in excess of government regulations subjecting my family to radiation." N.T. 108–09.

By limiting appellants' evidence to their own testimony of their reasons for committing the trespass, the trial court— as it recognized it was doing—effectively denied appellants the opportunity to prove justification. For as already discussed, it was not enough for appellants to prove that they *believed* that "the harm or evil sought to be avoided [by their conduct] [was] greater than that sought to be prevented by the law defining [their conduct as criminal trespass]." 18 Pa.C.S.A. § 503(a)(1). They had to prove that they *reasonably* so believed. And they could not prove their reasonableness without proving what in fact "the harm or

evil sought to be avoided" *was*. A defendant may *believe* that a nuclear reactor is likely to melt down and cause a catastrophic accident, or that radiation leakages are causing cancer and poisoning the reservoir. But without any *basis in fact* these beliefs cannot be *reasonable*. By rejecting appellants' offer of the expert testimony and documentary evidence summarized in their offer of proof, the trial court precluded appellants from proving that their beliefs did have a basis in fact. Thus the court precluded appellants from proving that their beliefs were reasonable. The result was to force appellants into the position of maintaining to the jury that their trespass was justified by their private, unsupported judgment. This was exactly the position that appellants by their offer of proof had sought to avoid, for as their offer of proof showed, they recognized that "[t]he balancing of evils cannot ... be committed to the private judgment of the actor ...." Model Penal Code, *supra*, § 3.02, Comments at 5.

■ To be sure, perhaps appellants would not have been able to prove justification anyway. The jury might have rejected their experts' testimony, and might have interpreted the documentary evidence differently than appellants do. But appellants were entitled to have the jury hear their evidence.

> In determining whether or not to allow a defendant to raise the defense of necessity, a trial judge should only decide whether or not the question of values presented by the defendant is frivolous. If the values asserted by the defendant are so bizarre as to be clearly unacceptable to any significant portion of the community, the defense should not be allowed.
>
> Arnolds & Garland, The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil, 65 J.Crim.L. & Criminology, 289, 296 (1974).

The values asserted by appellants were in no sense either frivolous or bizarre. If the jury had heard, and accepted, their evidence, it might have found justification. For "[t]he balancing of evils" would have disclosed, on the one side, a

brief, peaceful, physically harmless trespass, and on the other, a continuing risk of catastrophic accident and the continuing infliction by low-level radiation of grave injuries. It was therefore error for the trial court to reject appellants' offer of proof, thereby precluding them from proving justification.[2]

In its opinion the trial court states that it "could properly have excluded [appellants'] proffered evidence on the grounds that 18 C.P.S.A. § 503(b) was not satisfied since each [appellant] was 'reckless or negligent ... in appraising the necessity for his conduct' because non-criminal alternatives were available to avoid any impending danger." Slip op. at 5. The court then goes on to say that "[a]n alternative course of action for [appellants] herein would have been to present their evidence of danger to the Nuclear Regulatory Commission or the State Department of Health and to take appeals from adverse decisions ...." *Id.* at 6. We are not persuaded by this reasoning. In the first place,

**2.** In this regard, another court has suggested that if the defense of justification were permitted, courts would have to allow it in any case in which it is raised, regardless of the amount of damage done:

> If nuclear power presents the kind of threat to life and health contemplated by the compulsion statute, then if and when the Wolf Creek Plant becomes operational those who reasonably feel threatened by its presence would be legally justified in destroying it—by explosives or any other means available.

> *State v. Greene,* 5 Kan.App.2d 698, 700, 623 P.2d 933, 936 (Kan.Ct. App.1981).

This appears also to be Judge JOHNSON's view. Dissenting op. at 489. We find this suggestion unpersuasive, for the defense of justification should not be available to a defendant who has destroyed a plant, or, in one of the dissent's examples, City Hall. In such a case the trial court should rule as a matter of law that the defendant could not have reasonably believed that destroying the plant was "necessary to avoid [the] harm or evil" sought to be avoided. *See State v. Wooten,* Crim. No. 2685 (Cochise Cty., Ariz. Sept. 13, 1919) (unreported), reproduced in Comment, The Law of Necessity and the Bisbee Deportation Case, 3 Ariz.L.Rev. 264, 276–277 (1961) ("if at any time the accused went beyond the limits of necessity, or of what reasonably appeared to be necessary, the necessity then ceased to exist, and thereafter criminal responsibility would attach to any further acts committed, ...); LaFave & Scott, Handbook on Criminal Law 286–87 (1972). No doubt many cases may be supposed in which it would be clear as a matter of law that a reasonable belief could not be proved. But in this case that is not so.

it assumes that no relief was sought from the Nuclear Regulatory Commission or the State Department of Health. Appellants' offer of proof, however, was to "present testimony and documentary evidence detailing the many and varied activities aimed at shutting down the Shippingport Nuclear Power Plant or eliminating the danger emanating from the plant," and to "show that these efforts have been without result." And in the second place, appellants also offered to "demonstrate the futility of action within the nuclear regulatory system." In short, what the trial court's statement comes down to is a statement that it could refuse to permit evidence offered to prove that certain courses of action were futile, and at the same time justify its refusal on the ground that *it* knew, not only *despite* the offered evidence but without *any* evidence, that those courses of action were *not* futile.

Neither are we persuaded by the trial court's citation to *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). There the charge was escape from prison. The Court withheld the common law defenses of duress and necessity on the ground that reasonable legal alternatives to violating the law existed. As the Court said:

> Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm," the defenses will fail.

*Id.* at 410, 100 S.Ct. at 634 (quoting LaFave & Scott, Criminal Law 379 (1972)).

However, Section 503(a)(1) of the Crimes Code does not require that a defendant pleading justification must prove exhaustion of other alternatives, for as stated in the comment to the Section: "[T]he formulation makes the actor's belief in the necessity sufficient .... Questions of immediacy and of alternatives have bearing, of course, on the genuineness of a belief in necessity, ...." Model Penal Code § 3.02 Comment at 10.

In any case, appellants did offer to prove that they had exhausted other reasonable alternatives. As they correctly pointed out in their memorandum, "Whether or not all other legal alternatives are ineffective, unavailable or already exhausted depends in part on how soon the threatened harm will become manifest." Appellants represented in their offer that they would offer evidence that there "*is* the *continuous risk* of a serious accident" (emphasis added), and that "low-level radiation which is released *continuously* in the normal day-to-day operation of the plant ... *has already resulted* in increased infant mortality and birth defects as well as increased incidence of cancer in adults" (emphasis added). Appellants also represented in their offer that they would "present testimony and documentary evidence detailing the many and varied activities aimed at shutting down the Shippingport Nuclear Power Plant or eliminating the danger emanating from the plant," and that "[that] evidence will show that these efforts have been without result" and "will demonstrate the futility of action within the nuclear regulatory system and either the state or federal legislatures." Fairly read, these representations were an offer to prove that before their trespass, appellants had exhausted the legal alternatives to eliminating an existing and continuing evil.

Again, it should be noted that appellants might not have been able to prove what they offered to prove. Just as the jury might have rejected appellants' evidence that there *was* an existing and continuing evil, it might have found that *even if* there was such an evil, appellants had acted precipitously—in other words, that there were other, legal, alternatives available to them that were not futile and should have been tried, and that, therefore, appellants had failed to prove, as required by Section 503(a)(1), that they reasonably believed their criminal conduct to be "necessary to avoid [the] harm or evil [resulting from the operation of the Shippingport Plant]." However, by its ruling rejecting appellant's offer of proof, the trial court deprived appellants

of the opportunity to present their evidence, and the jury of the opportunity to appraise it.

In rejecting appellant's offer of proof, the trial court made plain its belief that even if appellants had been permitted to present their evidence, they would not have been able to prove that their trespass was justified. Thus after concluding that appellants' trespass could not have been justified since appellants failed to pursue alternatives, the court states: "To allow [appellants] to engage in criminal activity and then escape the consequences by asserting a defense of justification, although alternative courses of action existed, would be to encourage chaos and anarchy. However well-intentioned and sincere in the beliefs which motivated them [appellants] unjustifiably attempted to circumvent procedures legislated by the majority and thus acted in a manner which cannot be tolerated if our system of democracy is to survive." Slip op. at 6. The court then states: "At most [appellants'] actions could only have led to a heightened public awareness of the issues which could just as easily have been accomplished through non-criminal demonstrations and other dissemination of information." *Id.* at 6–7. In considering these observations, we have encountered two difficulties.

First, appellants' offer of proof, rather than suggesting that appellants circumvented "procedures legislated by the majority," contains assertions that appellants had sought relief through regulatory channels, to no avail. Second, the trial court's statements disclose that *it* has made the choice of values that should be made by the jury, which is to say, the court's opinion depends upon the unexpressed assumption that appellants' objections to the Shippingport Power Plant are groundless.

Suppose that instead of rejecting appellants' offer of proof, the court had permitted appellants to call the witnesses they wished to call. Suppose further that these witnesses had testified, without contradiction, and with the most unequivocal documentation, drawn from the plant's own records, that at any given moment the plant might

break down and another Three Mile Island incident ensue. Suppose still further that the witnesses had demonstrated that radiation from the plant had already caused cancer in a given number of people living nearby. And finally, suppose that it appeared that complaints to those operating the plant and to the regulatory authorities had been futile. All of this testimony would have been within appellants' offer of proof.

In forming an opinion of appellants' motives, the trial court assumed a power properly exercisable only by a jury. We should not be surprised if the jury, had it had the opportunity to hear appellants' evidence, would have been as unpersuaded by appellant's defense as was the trial court, and if that had occurred, we should have no hesitancy in affirming appellants' sentences. But the jury *didn't* hear the evidence. And it should have. As has been well said:

> Ordinarily the question here involved is one of fact to be determined by the jury. As was said in *Hale v. Lawrence*, 21 N.J.L. 714:
>
>> This justification, therefore, under a plea of necessity is always a question of fact to be tried by a jury and settled by their verdict, unless the sovereign authority shall have constitutionally provided some other mode.
>>
>> This, of course, must be taken to mean that where there is evidence tending to establish such justification, its weight and sufficiency are for the jury, and the Court may pass upon it as a matter of law only where evidence is wholly wanting and may exclude proof of a given state of facts only when that state of facts could not in any event warrant the interposition of this plea.
>
> *State v. Wooten*, Crim. No. 2685 (Cochise Cty. Ariz., Sept. 13, 1919) (unreported), reproduced in Comment, The Law of Necessity and the Bisbee Deportation Case, 3 Ariz.L. Rev. 264, at 273 (1961).

*See also Mitchell v. Harmony*, 54 U.S. (13 How.) 115, 133, 14 L.Ed. 75 (1851) (question whether danger existed was for jury); *Commonwealth v. Blodgett*, 53 Mass. (12 Met.) 56,

71 (1846) (approving jury instruction: "the jury and not the State of Rhode Island, was the proper judge [of necessity]"); *Aldrich v. Wright*, 53 N.H. 398, 402, 403 (for jury to say whether danger so imminent as to make defendant's shot reasonably necessary).

2

So far we have assumed that in defining the defense of justification, Section 503 of the Crimes Code means just what it says: that the actor must reasonably believe his conduct "to be necessary to avoid a harm or evil," and that the harm or evil sought to be avoided must be "greater than that sought to be prevented." 18 Pa.C.S.A. § 503. The trial court, however, held that appellants failed to satisfy the requirements of the common law defense of necessity. Thus, relying on *State v. Marley*, 54 Haw. 450, 509 P.2d 1095 (1973), the trial court states that appellants were required to, but did not, show "imminence of the harm to be avoided" and "a direct causal relationship or nexus between [their] actions and avoidance of anticipated harm." Slip op. at 6.

We acknowledge that the common law is sometimes helpful in solving problems of statutory construction. *But see* 18 Pa.C.S.A. § 107(b) (abolishing common law crimes). Settled principle, however, precludes us from referring to the common law in construing a criminal statute so as to give it a meaning less favorable to the accused than do the plain terms of the statute. For we must construe a criminal statute narrowly, which is to say, in favor of the accused. *See* 1 Pa.C.S.A. § 1928(b); *Commonwealth v. Duncan*, 456 Pa. 495, 321 A.2d 917 (1974); *Commonwealth v. Ashford*, 263 Pa.Super. 100, 397 A.2d 420 (1979); *Commonwealth v. Darush*, 256 Pa.Super. 344, 389 A.2d 1156 (1978). As the Supreme Court has said in *Commonwealth v. Exler*, 243 Pa. 155, 162-63, 89 A. 968, 971 (1914): "[W]hen a criminal statute calls for construction it is not the construction that is supported by the greater reason that is to prevail, but that one which, if reasonable, operates

in favor of life and liberty." *See also Commonwealth v. Teada,* 235 Pa.Super. 438, 344 A.2d 682 (1975) (if two inconsistent constructions of penal statute are both reasonable, construction favorable to accused must be adopted). *And see Commonwealth v. Trowbridge,* 261 Pa.Super. 109, 395 A.2d 1337 (1978) (examination of common law permitted when narrow construction of penal statute results).

For our part, we find the common law unclear. Although *State v. Marley, supra,* does indeed describe the common law defense of necessity as the trial court says, we are not persuaded that the requirements that the harm be imminent and that "a direct causal relationship or nexus [exist] between the defendants' actions and avoidance of anticipated harm" are "prerequisites to the defense of necessity." For the defense has been described much more generally. Thus the United States Supreme Court has not insisted upon proof of "a direct causal relationship or nexus." Instead, in deciding whether necessity was shown, the Court has examined the reasonableness of the actor's conduct as that appears in light of all of the circumstances, stating in *Mitchell v. Harmony, supra* that:

> In deciding upon this necessity, however, the state of the facts, as they appeared to the officer at the time he acted, must govern the decision; for he must necessarily act upon the information of others as well as his own observation. And if, with such information as he had a right to rely upon, there is reasonable ground for believing that the peril is immediate and menacing, or the necessity urgent, he is justified in acting upon it; and the discovery afterwards that it was false or erroneous, will not make him a trespasser. But it is not sufficient to show that he exercised an honest judgment, and took the property to promote the public service; he must show by proof the nature and character of the emergency, such as he had reasonable grounds to believe it to be, and it is then for a jury to say, whether it was so pressing as not to admit of delay; and the occasion such, according to the

information upon which he acted, that private rights must for the time give way to the common and public good. 54 U.S. at 135.

Similarly, other cases manifest concern that the actor's conduct be proportionate to the emergency—that no greater force be used than is necessary to meet the danger, and that the consequences of a course of action be considered. The case in which the defendant had destroyed buildings adjoining a burning structure was a typical one in which the necessity defense was invoked at common law. *See, e.g., Hale v. Lawrence, supra. See also* Model Penal Code § 3.02, Comment, collecting cases. In such a case, had the defendant destroyed buildings several blocks away from the burning structure, the sincerity of his belief that his actions were necessary to protect the neighborhood, and hence the reasonableness of his conduct in meeting the danger, might well be questioned. *Aldrich v. Wright, supra,* in which the New Hampshire Supreme Court held that the defendant could assert the necessity defense when he killed minks out of season in violation of a statute, to save his geese, provides another illustration:

> There is a great difference between an attack made upon A by B, and an attack made upon him by B's dog. On A's side, the consequences of his being killed by B, and the consequences of being killed by B's dog, may not be materially different. But on the other side, the consequences of his defending himself by killing B and the consequences of his defending himself by killing B's dog, regarded from a human point of view which is the one adopted by human law, are very different. The difference in the common-law values of the lives destroyed exhibits the reasonableness of adjusting the quality, quantity, and time of defensive force with some reference to consequences.

*Aldrich v. Wright, supra* at 405.

Nor were the common law cases concerned exclusively with simple emergency situations, such as the case of a burning building, as some courts have suggested. *See, e.g.,*

*State v. Dorsey,* 118 N.H. 844, 846, 395 A.2d 855 (1978) (common law defense dealt with "obvious and generally recognized harms"). While some common law cases were concerned with situations that may appear straightforward or simple, *see, e.g.,* Model Penal Code § 3.02 Comment at 9 (listing examples), others were concerned with situations in which the harms seem no more "obvious and generally recognized" than do the harms in the present case. In *Mitchell v. Harmony, supra,* jurors considered the defense of necessity to a charge that a military commander had taken personal property for the purpose of preventing it from falling into the hands of the enemy (jury convicted). In *Commonwealth v. Blodgett, supra,* they considered the defense to charges of kidnapping where the defendant was charged in Massachusetts with kidnapping and returning to Rhode Island followers of Dorr, who had fled from Rhode Island to Massachusetts during the so-called Dorr rebellion (jury convicted). And in *State v. Wooten, supra,* the defendant had participated in a posse that rounded up members of the Industrial Workers of the World who were striking copper miners and took them to New Mexico (jury acquitted).

 In any event, this case does not require us to decide just what were the requirements of the common law. For the point is, not what the *common law* is, but what our *statutory law* is. And under our statutory law—Sections 502 and 503 of the Crimes Code—appellants were not required to prove what the trial court held they were. They were only required to prove that they reasonably believed their conduct "to be necessary to avoid a harm or evil," and that "the harm or evil sought to be avoided ... [was] greater than that sought to be prevented by the law defining [their conduct as criminal trespass]." The trial court's imposition of additional requirements, with the consequent rejection of appellants' offer of proof, was therefore error.[3]

---

3. We are aware of other state court cases in which the defense of justification or necessity has been raised to a charge of criminal trespass at a nuclear power plant. Although these cases reach a

■ One further comment seems in order. The trial court appears to have regarded appellants' trespass as an act of civil disobedience. *See Commonwealth v. Averill,* 12 Mass.App. 260, ——, 423 N.E.2d 6, 7 (1981). Thus, as we have mentioned, the court characterizes appellants' actions as "actions [that] could only have led to a heightened public awareness." In our view, however, this is not a case of civil disobedience. Civil disobedience is breaking a law on the ground that it is immoral; one recognizes, and perhaps expects, that the court may uphold the law, and if that occurs, one is willing, perhaps eager, to accept the punishment prescribed by the law. Thus Gandhi said to his English judge that the judge *should* sentence him:

> Nonviolence implies voluntary submission to the penalty for non-co-operation with evil. I am here, therefore, to invite and submit cheerfully to the highest penalty that

different result than we do, they are distinguishable, either because they turn upon the common law defense of necessity, *State v. Warshow,* 138 Vt. 22, 410 A.2d 1000 (1979); *Commonwealth v. Brugmann,* 13 Mass.App. 373, 433 N.E.2d 457 (1982); *People v. Hubbard,* 115 Mich.App. 73, 320 N.W.2d 294 (1982) (*per curiam* ); *Commonwealth v. Averill,* 12 Mass.App. 260, 423 N.E.2d 6 (1981), or because they interpret statutes that are not based on Section 302 of the Model Penal Code, *State v. Kee,* 398 A.2d 384 (Me.1979); *State v. Dorsey,* 118 N.H. 844, 395 A.2d 855 (1978); *State v. Greene,* 5 Kan.App.2d 698, 623 P.2d 933 (1981); *People v. Chachere,* 104 Misc.2d 521, 428 N.Y.S.2d 781 (Suffolk County 1980). Moreover, in most of the cases the defendants' offer of proof was found insufficient. *State v. Warshow, supra* 138 Vt. at 24, 410 A.2d at 1002 (offer cited long-range risks, not immediate hazards of radiation); *Commonwealth v. Brugmann, supra* 13 Mass.App. at ——, 433 N.E.2d at 462 (insufficient showing that there were no alternatives or that pursuit of them would be futile); *Commonwealth v. Averill, supra* 12 Mass.App. at ——, 423 N.E.2d at 7 (protest limited to publicity about the general dangers of nuclear power); *State v. Greene, supra* 5 Kan.App.2d at 700, 623 P.2d at 936 (no offer of proof of record); *People v. Chachere, supra* 104 Misc.2d at 522, 428 N.Y.S.2d at 782 (defendant had no personal knowledge of plant defects). In *State v. Dorsey, supra,* the New Hampshire Supreme Court took a narrow view of the common law defense of necessity, requiring that it be raised only as a defense to an imminent and recognizable harm. The court, however, appears to have based its decision on preemption of the justification defense by federal and state nuclear power statutes. *People v. Hubbard, supra,* relying on *Dorsey,* also found preemption. As we shall discuss, we find no preemption of the defense of justification contained in Section 503 of the Crimes Code.

can be inflicted upon me for what in law is a deliberate crime and what appears to me to be the highest duty of a citizen. The only course open to you, the judge, is either to resign your post, and thus dissociate yourself from evil if you feel that the law you are called upon to administer is an evil and that in reality I am innocent, or to inflict on me the severest penalty if you believe that the system and the law you are assisting to administer are good for the people of this country and that my activity is therefore injurious to the public weal.

Gandhi, A Plea for the Severest Penalty Upon Conviction for Sedition, March 23, 1922, reprinted in The Law as Literature 459, 465–66 (E. London ed. 1960).

Appellants' position is not that they have *broken* the law, but that their conduct was *permitted* by the law, specifically, by Section 503 of the Crimes Code.

The distinction between civil disobedience and justification has been noted by others. For example, commenting upon *United States v. Moylan*, 417 F.2d 1002 (4th Cir.1969), and other similar cases in which the defendants had destroyed selective service records, Arnolds and Garland observe:

Although in the above cases the protestors claimed they were destroying property to save lives, they sought to convince the jury that the symbolic destruction of property in which the defendants engaged was justified as a protest against an illegal war. Such protestors often speak of obeying a higher moral law or their conscience. To this argument the court in *United States v. Moylan* responded that the defendants' motivation and sincere belief that they were breaking the law in a good cause is not acceptable as a legal defense or justification. The court stated that "[i]t implies no disparagement of their idealism to say that society will not tolerate the means they chose to register their opposition to the war."

Yet this response seems rather to beg the question. Mere subjective good motive, as where one acts purely on a religious belief, is no defense to a criminal act. *Wheth-*

*er society will consider a particular form of opposition to its government's policies justified is a different question, and one that can really only be answered by the jury which acts as the spokesman for society.*

Arnolds & Garland, *supra* at 300–01 (footnotes omitted) (emphasis added).

*United States v. Best,* 476 F.Supp. 34 (D.Colo.1974), relied upon and is similar to *Moylan.* There the defendants said that "they were forced to trespass because of some overpowering force which mandated their violation of the criminal law." *Id.* at 42. *See also United States v. Cullen,* 454 F.2d 386 (7th Cir.1971) (defendant's testimony of compulsion limited to religious beliefs). Appellants, however, do not claim to have acted under the compulsion of any religious belief, individual standard, or subjective good motive, but on the basis of objective facts. While some of appellants' remarks at trial suggest that they engaged in civil disobedience, their claim, as their offer of proof makes plain, was that expert testimony and documentary evidence would have shown that the Shippingport plant continuously released low level radiation that was causing cancer, and was so designed as to threaten a catastrophic accident, and, further, that they reasonably believed their conduct necessary to avoid a harm greater than that sought to be prevented by the law making it a crime. As Arnolds and Garland say, the question raised by that claim "can really only be answered by the jury which acts as the spokesman for society."

To characterize appellants' trespass an act of civil disobedience confuses the *effect* of an act with its *legal nature.* To be sure, a trespass committed under religious, or other individual moral, compulsion may have the same *effect* as a trespass committed under claim of legal justification: both may lead to "a heightened public awareness" of a particular situation. But that does not mean that the *legal nature* of the two acts is the same. A kills X, and B kills Y. The effect of the act of each is the same, but it cannot be determined whether each, or either, is a murderer without

knowing why each killed. For the trial court to dismiss appellants' trespass as directed toward heightening public awareness of the dangers of nuclear power was to ignore appellants' offer of proof. Appellants do not plead any right of civil disobedience. They plead—and claim that if given the chance, they can prove—justification under Section 503 of the Crimes Code.

### 3

The principal basis of the trial court's rejection of appellant's offer of proof appears to have been its "finding that both Congress and the State legislatures have promulgated legislation dealing in detail with the production of nuclear energy, expressing the clear intent to maintain such operations as the Shippingport Power Plant, subject to strict governmental control and regulation." Slip op. at 4–5. Thus the court states: "18 C.P.S.A. § 503(a)(3) plainly dictates that we must accept the clear legislative intent expressed [in federal and state regulation regulating nuclear power] and assume that Congress and the State Legislature do not intend that private citizens make individual determinations regarding the wisdom of operating nuclear power plants." Slip op. at 5. We have concluded, however, that the defense of justification has not been preempted.

So far it has been necessary only to consider Section 503(a) down through subsection (1)—the subsection that requires that "the harm or evil sought to be avoided" must be "greater than that sought to be prevented." However, in order to address the trial court's conclusion that subsection (a)(1) has been pre-empted by nuclear power legislation, it is necessary to examine subsections (a)(2) and (a)(3) of Section 503, for these subsections specify requirements in addition to the requirements specified in Section 503(a)(1). Before conduct may be found justifiable, it must appear that

(2) neither this title nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification does not otherwise plainly appear.

18 Pa.C.S.A. § 503(a)(2) and (a)(3).

We may start with an examination of Section 503(a)(2). For it and Section 503(a)(3) are clearly related, and whenever we construe one section of a statute, we must read it, not by itself, but with reference to, and in the light of, other sections of the statute. *See In re Interest of Jones*, 286 Pa.Super. 574, 429 A.2d 671 (1981).

Section 503(a)(2) specifies two requirements that must be satisfied, if justification is to be proved: the Crimes Code ("this title") must not "provide[ ] exceptions or defenses dealing with the specific situation involved;" and neither may any "other law defining the offense [that the defendant pleading justification is charged with committing]." Here, both requirements are satisfied. The Crimes Code does provide "exceptions or defenses" to criminal trespass—the crime that appellants were charged with committing. But none of these exceptions or defenses "deal[s] with the specific situation involved." [4] And there is no "other law defining the offense [that appellants are charged with committing]."

Section 503(a)(3) specifies still another requirement that must be satisfied, if justification is to be proved: "a legislative purpose to exclude the justification does not otherwise plainly appear." The question that arises in construing this requirement is, What does "otherwise" mean? When Sec-

4. Criminal trespass is defined by Sections 3503(a) and (b) of the Crimes Code. Section 3503(c) provides:

 **(c) Defenses.**—It is a defense to prosecution under this section that:

 (1) a building or occupied structure involved in an offense under subsection (a) of this section was abandoned;

 (2) the premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the premises; or

 (3) the actor reasonably believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him to enter or remain.

18 Pa.C.S.A. § 3503(c).

tion 503(a)(3) is construed with Section 503(a)(2), the answer to this question is clear.

■ Together, Sections 503(a)(2) and (a)(3) provide four ways by which one may find a legislative purpose to preclude the defense of justification. First, the Crimes Code may provide "exceptions or defenses dealing with the specific situation involved." Second, some "other law defining the offense" may provide such exceptions or defenses. Third, if no such exceptions or defenses appear in the Crimes Code, a legislative purpose to preclude the defense of justification may nevertheless "otherwise plainly appear" in the Code. And fourth, if no such exceptions or defenses appear in some "other law defining the offense," a legislative purpose to preclude the defense of justification may nevertheless "otherwise plainly appear" in such other law. In other words: the defense of justification is precluded only if a legislative purpose to preclude it is found *in the criminal statute itself.*

This conclusion is consistent with commentary:

The defense of necessity is available only in situations wherein the legislature has not itself, in its criminal statute, made a determination of values. If it has done so, its decision governs. Thus the legislature might, in its abortion statute, expressly provide that the crime is not committed if the abortion is performed to save the mother's life; under such a statute there would be no need for courts to speculate about the relative value of preserving the fetus and safeguarding the mother's life. Conversely the abortion statute might expressly (or by its legislative history) provide that the crime is committed even when the abortion is performed to save the mother's life; here too the legislature has made a determination of values and by its decision thereon foreclosed the possibility of the defense that the abortion was necessary to save life. But if the abortion statute (even when read in the light of its legislative history) is silent upon the matter, then the question of the defense of necessity is open, and

courts can properly consider the relative merits of preserving the fetus and saving the mother.

LaFave & Scott, Handbook on Criminal Law 382 (1972) (footnotes omitted).

*See also* Model Penal Code § 3.02 *supra,* Comment at 6 (giving same example).

■ Accordingly, it is apparent that here, the requirements of Section 503(a)(3) have been satisfied. For a legislative purpose to preclude the defense of justification to a charge of criminal trespass does *not* "otherwise ... appear," "plainly" or in any other way, either in the Crimes Code or in any "other law defining the offense [of criminal trespass]" (as already mentioned, there is no such "other law").

■ The trial court does not consider Section 503(a)(2). Focusing only on Section 503(a)(3), the court construes "otherwise plainly appear" to mean that a legislative purpose to preclude the defense of justification may be found *anywhere*—not only in the Crimes Code (where the court evidently concedes it does not exist), nor in any "other law defining the offense" (the court evidently concedes that there is no such "other law"), but in *any* statute, civil or criminal, enacted at *any* time, before or after the Crimes Code, and not only by the General Assembly but also by the Congress. This construction is in our opinion contrary to settled principle. It is contrary to the principle that whenever we construe one section of a statute—here, Section 503(a)(3)—we must read it, not by itself, but with reference to, and in light of, other sections—here, Section 503(a)(2). *In re Interest of Jones, supra.* Even more important, it is contrary to the principle that, as part of a penal statute, the phrase "otherwise plainly appear" must be narrowly construed, in appellants' favor. 1 Pa.C.S.A. § 1928(b); *Commonwealth v. Duncan, supra; Commonwealth v. Ashford, supra; Commonwealth v. Darush, supra.* Here, a narrow construction of the phrase "otherwise plainly appear" is doubly required because the phrase is part of a statute making a defense available to one accused of crime;

an accused has a fundamental right to submit to the jury whatever defenses are legally available to him. *See, e.g., Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Commonwealth v. Greene,* 469 Pa. 399, 366 A.2d 234 (1976). Instead of abiding by these principles, the trial court has construed the phrase "otherwise plainly appear" broadly, indeed, as broadly as possible, against appellants as the accused and so as to undermine their defense.

■■ Having concluded that the phrase "otherwise plainly appear" permits reference to any statute, civil or criminal, enacted at any time, by either the General Assembly or the Congress, the trial court refers generally to two sets of statutes: federal legislation regulating the construction and operation of nuclear power plants, and state legislation encouraging the development and use of atomic energy. The trial court did not say *which section* of *which* statute "plainly" shows that appellants are precluded from proving justification. Lacking the guidance of any specific citation, we have reviewed the Atomic Energy Development and Radiation Control Act, 73 P.S. §§ 1001–1501, cited generally by the court, and can find no section of the Act that suggests that in enacting it the General Assembly meant to displace any part of our criminal laws.[5] Neither do we find any federal preemption.

It is of course true that federal law has supremacy over state law, if the two are incompatible. U.S. Const. art. VI, cl. 2 (supremacy clause). But "[a]n unexpressed purpose of Congress to set aside statutes of the states is not lightly to be inferred and ought not to be implied where the legislative command, read in light of its legislative history, is

---

5. The Atomic Energy Development and Radiation Control Act, 73 P.S. §§ 1001–1501, empowers the Governor to enter into agreements with the federal government discontinuing federal supervision over certain aspects of radiation, *id.* § 1102. *See* Atomic Energy Act, 42 U.S.C. § 2021(b) (authorizing the Nuclear Regulatory Commission to enter such agreements). The Act also makes the Department of Health responsible for the control and regulation of sources of radiation, 73 P.S. § 1301, and provides for their licensing, *id.* § 1302, and record keeping, *id.* § 1303.

ambiguous. Considerations which lead us not to favor repeal of statutes by implication should be at least as persuasive when the question is one of the nullification of state power by Congressional legislation." *Penn Dairies, Inc. v. Milk Control Commission,* 318 U.S. 261, 275, 63 S.Ct. 617, 623, 87 L.Ed. 748 (1943). Congress must "unmistakably ... ordain[ ], ... that its enactments alone are to regulate a part of commerce." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (quoting *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). "[I]n deciding whether Congress has 'unmistakably ... ordained' that its enactment supersedes a State's law, a court is to proceed with caution; it must 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Lukus v. Westinghouse Electric Corp.,* 276 Pa.Super. 232, 245, 419 A.2d 431, 438 (1980), *allocatur refused,* June 1, 1980 (*quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). *See Pacific Gas and Electric Company v. State Energy Resources Conservation and Development Commission,* 461 U.S. 190, 203–204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983).

Accordingly, as an exercise of "historic police powers," Section 503(a) of the Crimes Code has not been superseded by a federal nuclear power statute, unless that statute discloses a "clear and manifest purpose" to supesede it. Is such a purpose disclosed?

The Atomic Energy Act, 42 U.S.C. §§ 2011–2296, contains a declaration of policy directing "the development, use and control of atomic energy ... so as to make the maximum contribution to the general welfare." *Id.* § 2011. It contains provisions regulating the production of nuclear materials, *id.* §§ 2061–2112, and the military use of nuclear materials, *id.* §§ 2121–2122; it also contains licensing provisions, *id.* §§ 2131–2140. The Energy Reorganization Act, 42 U.S.C. §§ 5801–5891, contains a declaration of policy "that

the general welfare and the common defense and security require effective action to develop, and increase the efficiency and reliability of use of, all energy sources to meet the needs of present and future generations, ...." *Id.* § 5801(a). It transfers the functions of the Atomic Energy Commission to the Nuclear Regulatory Commission, *id.* § 5814, and sets forth the duties of the Commission, *id.* §§ 5841–5849. Without doubt, the Atomic Energy Act and the Energy Reorganization Act are comprehensive regulatory schemes. But in neither do we find a "clear and manifest purpose" to supersede Section 503(a)—or any other provision of our criminal statutes.

In *Lukus v. Westinghouse Electric Corp., supra,* this court considered whether the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144, preempted provisions of the Pennsylvania Human Relations Act (PHRA), prohibiting discrimination on the basis of sex. ERISA contained a provision explicitly preempting state law. Even so, we found no preemption of PHRA, for the purposes of the two statutes were different. We said: "In instances, ... where a state law relating primarily to matters not governed by ERISA only indirectly affected employee benefit plans, that is, in a way not in conflict with the purposes ERISA was designed to achieve, courts have usually held that the state law was not preempted." *Id.* 276 Pa.Super. at 248, 419 A.2d at 439.

The same may be said here (indeed, it may be said even more forcefully, given that here, in contrast to ERISA, the nuclear power statutes contain no explicit preemptive provision operative here).[6] The purpose of the nuclear power statutes is to establish a broad framework for the development and control of atomic energy. The purpose of the Crimes Code includes: "[t]o forbid and prevent conduct that

6. A state's power to control radiation hazards at nuclear power plants has been preempted by the Atomic Energy Act, 42 U.S.C. § 2021, unless the state executes an agreement with the federal government. *See Northern States Power Company v. State of Minnesota,* 447 F.2d 1143 (8th Cir.1971), *aff'd mem.* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972).

unjustifiably inflicts or threatens substantial harm....";
"[t]o safeguard conduct that is without fault from condemnation as criminal;" and "[t]o safeguard offenders against
... arbitrary punishment." 18 Pa.C.S.A. § 104. Section
503(a) of the Code implements this general statement of
purpose, for as discussed above, the defense of justification,
"properly conceived ... is essential to the rationality and
justice of all penal provision." Model Penal Code, *supra*,
§ 3.02, Comment at 5.

It is also useful to compare the federal nuclear power
statutes with the federal labor relations statutes. By the
Wagner Act, for example, Congress imposed a uniform
regulatory scheme, based on collective bargaining and
aimed at removing obstructions to the free flow of commerce that had developed as a result of labor and management conflicts. *See* 49 Stat. 449 (1935) (codified at 29 U.S.C.
§ 151 (1976)). While the federal labor relations statutes
have therefore preempted many aspects of governmental
regulation of labor-management relationships, they have
not preempted all aspects. *See, e.g., Sears Roebuck & Co.
v. San Diego County District Council of Carpenters*, 436
U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1977) (state court
may enforce local trespass law against union's peaceful
picketing when union has failed to invoke jurisdiction of
National Labor Relations Board); *Farmer v. Carpenters
Local 25*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977)
(union member may maintain action in state court for
damages against union and union members for intentional
infliction of emotional distress); *Vaca v. Sipes*, 386 U.S.
171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1966) (union members
may maintain action in state court against union representatives for breach of duty of fair representation). In *Farmer
v. Carpenters Local, supra*, the Court stated:

We have refused to apply the pre-emption doctrine to
activity that otherwise falls within the scope of *Garmon*
if that activity "was a merely peripheral concern of the
Labor Management Relations Act ... [or] touched interests so deeply rooted in local feelings and responsibility

that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of power to act" .... We also have refused to apply the pre-emption doctrine "where the particular rule of law sought to be invoked before another tribunal is so structured and administered that in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted by the federal labor statutes." *Id.* 430 U.S. at 296–97, 97 S.Ct. at 1061. (*quoting San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 246–47, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959); and *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 297–98, 91 S.Ct. 1909, 1923, 29 L.Ed.2d 473 (1971).

This reasoning applies with particular force to the question whether the federal nuclear power statutes supersede the Commonwealth's criminal statutes. For certainly the enactment and enforcement of the criminal law is "deeply rooted in local feelings and responsibility." To set aside a state's responsibility to enforce its criminal law—a responsibility that must include the allowance to an accused of every defense made available by the state's law—would indeed require "compelling congressional direction." There is no such direction in any of the federal nuclear power statutes.

We therefore conclude that the defense of justification provided in Section 503(a) of the Crimes Code has not been preempted either by state or federal legislation regulating nuclear power, and that in holding otherwise, the trial court erred.

4

■ So far, like the trial court, we have discussed only Section 503 of the Crimes Code, for that is the only section that has been argued to us. Appellants have not claimed, nor has the Commonwealth asserted that they should have claimed, the defense of justification provided in Section 510 of the Crimes Code, which states:

Conduct involving the appropriation, seizure or destruction of, damage to, intrusion on or interference with

property is justifiable under circumstances which would establish a defense of privilege in a civil action based thereon, unless:

(1) this title or the law defining the offense deals with the specific situation involved; or

(2) a legislative purpose to exclude the justification claimed otherwise plainly appears.

18 Pa.C.S.A. § 510.

Nevertheless, Section 510 is necessarily implicated in this case, for appellants' conduct was "[c]onduct involving ... intrusion on ... property." Appellants therefore had to meet the requirements of Section 510 as well as those of Section 503, to the extent the two are consistent. *See* Model Penal Code, Scope of Article 3, at 1 (Section 3.02 "states a principle applicable to all crimes; ... it must yield to more specific formulations dealing with the particular situation posed in any concrete case."); *id.* § 3.01, Comment at 4 (Article 3 "is not designed to create privileges in the civil law."). We have therefore considered appellants' offer of proof in light of Section 510, and have concluded that the offer did meet its requirements.

 Preliminarily it may be noted that the defense of justification provided in Section 510 has not been preempted by federal and state legislation regulating nuclear power, any more than Section 503 has been preempted. The question therefore becomes whether appellants' conduct was justifiable under Section 510 because it occurred "under circumstances which would establish a defense of privilege in a civil action." 18 Pa.C.S.A. § 510. In considering this question, Section 196 of the Second Restatement of Torts is instructive. It provides:

One is privileged to enter land in the possession of another if it is, or if the actor reasonably believes it to be, necessary for the purpose of averting an imminent public disaster.

Restatement (Second) of Torts § 196 (1965).

In comment to Section 196 it is said that for the privilege to attach, the trespass must be committed "to protect against

or repel a public enemy, or to prevent or mitigate the effects of an impending public disaster such as a conflagration, flood, earthquake, or pestilence." Restatement (Second) of Torts § 196 Comment a. *And see Stocking v. Johnson Flying Service*, 143 Mont. 61, 387 P.2d 312 (1963) (damage to private property by aerial fire retardant to prevent spread of forest fire); *Fields v. Stokley*, 99 Pa. 306 (1882) ("If the owner or tenant of a powder magazine should madly or wickedly insist upon smoking a cigar on the premises, can anyone doubt that a policeman or even a neighbor could justify in trespass for forcibly ejecting him and his cigar from his own premises?"); *Respublica v. Sparhawk*, 1 Dall. (1 U.S.) 357, 1 L.Ed. 303 (Pa.1788) (citing as examples: building bulwarks on private property during war; pursuit of foxes on another's land; razing houses to prevent spread of fire); W. Prosser, Law of Torts 125 (4th ed. 1971) ("Where the danger affects the entire community, or so many people that the public interest is involved, that interest serves as a complete justification to the defendant who acts to avert the peril to all.").

The harms alleged in appellants' offer of proof—that at any given moment the Shippingport Plant may break down and another Three Mile Island incident ensue, and that radiation from the plant is causing cancer and poisoning the reservoir—are comparable to the harms caused by "conflagration, flood, earthquake, or pestilence." Thus appellants' offer met the "public disaster" requirement of the Restatement. Did the offer meet the further requirement that the disaster be "imminent"?

In commenting on the requirement of Section 196 that the public disaster be "imminent," it is said that "if the actor believes that the impending disaster may be prevented in some other way, and such is the fact, the entry is not privileged." Restatement (Second) of Torts § 196 Comment d. In contrast, under Section 503 of the Crimes Code, "[q]uestions of immediacy and of alternatives have bearing, ... on the genuineness of a belief in the necessity." Model Penal Code § 3.02 Comment at 10. Thus, if we read Section

196 of the Restatement into Section 510 of the Crimes Code, we emerge with a standard of justification stated somewhat differently from the standard stated in Section 503. *How* differently need not be decided in this case. Appellants' offer of proof alleged not simply an "imminent" harm but present and continuing harms: that the Shippingport Plant was *then* leaking radiation that was causing cancer and was poisoning the reservoir. The offer also alleged that appellants had exhausted other alternatives available to them to achieve relief from these harms. Thus if we assume for discussion that the standard of Section 510 is somewhat more exacting than that of 503, appellants' offer nevertheless met it.

The remaining requirement of Section 196 of the Restatement is that the actor "reasonably believes" in the necessity of his conduct. *See* Restatement (Second) of Torts § 196 Comment d ("a reasonable belief on the part of the actor in the necessity of the entry for the prevention or mitigation of a public disaster is sufficient to justify the entry."). *And see Seavey v. Preble*, 64 Me. 120 (1874) (reasonable belief that removing wallpaper from rooms where smallpox victims had been confined was necessary for public health). Under Sections 501 and 503(a)(1) the actor must "reasonably believe[ ]" his conduct "to be necessary to avoid a harm or evil to himself or to another," and "the harm or evil sought to be avoided" must be "greater than that sought to be prevented." 18 Pa.C.S.A. § 503. Again, therefore, by reading Section 196 of the Restatement into Section 510 of the Crimes Code we emerge with a standard of justification stated somewhat differently from the standard stated in Section 503. We do not, however, see any difference in substance, and we are satisfied that in meeting the requirement of Section 503 regarding reasonableness, appellants' offer of proof also met the requirement of Section 510 (*i.e.,* Section 196 of the Restatement) regarding reasonableness.

Finally, in comment to Section 196 it is said that "the actor is subject to liability for harm done in the unreasonable exercise of the privilege." Restatement (Second) of

Torts § 196 Comment b. Here, however, it is not claimed that appellants did any damage on the grounds of the Shippingport Plant during their trespass. The civil law privilege would therefore not be denied them on the ground that they are liable for damages.

We therefore conclude that appellants' offer of proof met the requirements of Section 510, to such extent as these requirements may be more exacting than the requirements of Section 503, and that appellants should have been permitted to present their evidence to the jury.

The judgments of sentence are reversed and the case remanded for a new trial at which appellants shall be permitted to prove, if they can, that their conduct was justified.

WIEAND, J., files a concurring and dissenting statement.

JOHNSON, J., files a dissenting opinion in which HESTER and WIEAND, JJ., join.

WIEAND, Judge, concurring and dissenting:

I agree with the majority that the record is adequate to permit appellate review of the trial court's ruling which refused to receive expert opinion and documentary evidence to show the reasonableness of appellants' several beliefs that the crimes which they admittedly committed were justified by the greater harm they were demonstrating against. That said, I hasten to put distance between myself and the majority opinion.

The decision of the majority, in my judgment, has so liberally expanded the purpose of the justification defense that it will inevitably encumber unnecessarily criminal trials in the future. Today we are concerned with trespassing demonstrators; tomorrow we may be required to deal with fanatic terrorists.

Having reviewed the record, I find myself in full agreement with the author of the dissenting opinion who concludes that appellants' offer of proof failed to establish the defense of justification which has been made available by 18

Pa.C.S. §§ 503 and 510. Therefore, I join the portion of the dissenting opinion which would hold that the trial court's exclusion of appellants' evidence was proper. Evidence of danger inherent in the use of nuclear power is irrelevant to appellants' guilt or innocence of criminal trespass. I would affirm the judgments of sentence.

JOHNSON, Judge, dissenting:

I respectfully dissent. The majority would permit Appellants to introduce evidence concerning their defense of justification when, as a matter of law, they were not entitled to the defense.

The salient facts are not in dispute. Appellants knowingly trespassed on the property of the Shippingport Nuclear Power Plant as part of a sit-in demonstration.[1] They were subsequently arrested and charged with criminal trespass. The trial court determined that Appellants were not entitled to introduce evidence in support of the justification defense, despite Appellants' submission of an offer of proof and memorandum in support thereof. Appellants were convicted of trespass and this appeal followed.

The majority would reverse and remand for a new trial, holding that Appellants were improperly denied the opportunity to prove their justification defense. I disagree.

Even while conceding that the defense of justification may be applicable in certain cases, I am concerned by the majority's rather generous reliance on self-serving assertions contained in a pre-trial memorandum of points and authorities to support its conclusions. It is clear from the transcript that defense counsel, on Thursday, November 29, 1979, towards the close of the first day's trial, stated on the record his intention to make a formal offer of proof to

1. The trial transcript indicates that a co-defendant, Vincent J. P. Scotti, whose appeal is not before us, was offered the use of the plant's parking lot for use as a legal demonstration site by the plant's Superintendent of Personnel. The Superintendent testified that Mr. Scotti understood the offer, "but it did not meet the intent of their demonstration." (N.T. p. 55).

preserve his position on appeal. R. Rex Downie, counsel for defendants, stated to the court:

> MR. DOWNIE: Your Honor, just so that the matters might be preserved to some degree of specificity, I would like to make five offers of proof and have the Court rule on them separately. If, indeed, we take the matter up on appeal, I can conceive of an Appellate Court asking us what we intended to prove, and that's not in the record.
>
> THE COURT: Why don't you submit those offers of proof in writing to the Court?
>
> MR. DOWNIE: Well, if we could recess until morning, I would be able to do that.
>
> THE COURT: Why don't you do that? We can have the matter of Record.
>
> (N.T. 77).

The next morning, following the court's dismissal of the conspiracy counts and its ruling that the third and fourth criminal trespass counts merged with the second count (thereby leaving only the second count of criminal trespass at issue in the case), Mr. Downie presented to the trial judge his formal offer of proof, in writing, as reflected in the following colloquy:

> MR. DOWNIE: Now, your Honor, to this point in the proceedings, none of the offers of proof which we have discussed have been made with what I presume to be sufficient specificity on the issue of self-defense and justification. Consequently, I have prepared and furnished to the Court a two-page summary of the first nine points being evidentiary areas on which we would present both lay and expert testimony to prove points 1 through 9 which we feel bear very strongly on the question of reasonable fear by the Defendants for personal safety of themselves and other persons. Then the second body of data on the second page under five headings summarizes certain government documents and reports, official reports, which reveal hazards of nuclear plant operation that again we feel would give warrant to a charge under

Section 501 and following of the Penal Code that would allow the Defendants to argue a defense of justification. THE COURT: The Defendants [sic] offers of proof are refused. An exception is noted to the Defendants. (N.T. 80–81).

Shortly following this in-chambers submission on November 30, 1979, the parties returned to open court and Mr. Downie immediately was granted permission for counsel to approach the bench. The following transpired:

## AT SIDE BAR

MR. DOWNIE: I would like to have the offers that I made in chambers marked as an offered exhibit and then refused.

(Whereupon, Defendants' Exhibit A was marked for identification.)

MR. DOWNIE: Your Honor, the offers that we've made are marked as Exhibit A.

THE COURT: All right. They will be admitted into the Record for the purpose for which it was offered. Of course, the ruling that we have made in chambers still stands.

MR. WYNN: In other words, this is admitted just to be made a part of the Record?

THE COURT: Just to show that such an offer was made; it's not allowed to go to the jury.

MR. DOWNIE: I understand.

(Whereupon, the side bar discussion was concluded, ...)

(N.T. 82–83).

There can be no doubt but that the Defendants' Offers of Proof which were formally referred to as part of the trial record should form the basis of any appellate review of the issue presented on this appeal. However, since the document was never made a part of the certified record forwarded to this court for purposes of appeal, and since the pre-trial memorandum upon which the majority so heavily

relies, and which was filed some ten days before trial, cannot be viewed as a substitute for an official record of what occurred at trial, the better course would be to refuse to consider Appellants' primary issue.

The document entitled Defendants' Offers of Proof appeared as an appendix to the Brief for Appellant filed with this court prior to oral argument on October 27, 1981. The xerox copy of the document attached to that Brief had written in the margin (as part of the xerox copy) the handwritten query: "was this entered into record?" When the same Brief was submitted to this court for oral argument before the court en banc on May 10, 1983, a copy of the same document was included as part of the reproduced record except that an attempt had been made to obliterate or erase the marginal query. Immediately following the document in the appendix is a cover page titled "Appellants' Correction to Reproduced Record" which is then followed by the identical document which has seemingly undergone xerographic reduction but upon which the attempted erasure is still evident.

The original papers and exhibits filed in the lower court, the transcript of proceedings, if any, and a certified copy of the docket entries shall constitute the record on appeal in all cases. Pa.R.A.P. 1921. Although the reproduced record attached to Appellants' brief contains the document styled "Appellants' Correction to Reproduced Record", there is no evidence that compliance was either had or attempted with Pa.R.A.P. 1926, which sets forth the procedure for correcting or modifying the record.

An offer of proof must be judged exclusively by its specific contents and the party advancing the offer is bound by the purpose stated. The ruling of the trial court must be evaluated by the contents of the offer at the time the offer was made. *Commonwealth v. Cain*, 471 Pa. 140, 149, 369 A.2d 1234, 1238 (1977) (opinion in support of affirmance, Eagen, J., with two justices concurring); *Commonwealth v. Gibson*, 264 Pa.Super. 548, 551, 400 A.2d 221, 222 (1979); *cf.*

*Commonwealth v. Harper*, 479 Pa. 42, 47 n. 1, 387 A.2d 824, 827 n. 1 (1978).

As Justice Roberts announced in *Commonwealth v. Young*, 456 Pa. 102, 114–15, 317 A.2d 258, 264 (1974):

> "Appellate review has become such an integral part of our criminal procedure that it may properly be viewed as an extension of the trial itself." ... The fundamental tool for appellate review is the official record of what occurred at trial. Only the facts that appear in this record may be considered by a court.... " [A]n appellate court cannot consider anything which is not a part of the record in the case." (citations omitted).

Because the disposition of this appeal on the merits should depend upon precisely what was contained in the offer of proof before the trial judge *at trial*, because the analysis made by the majority emphasizes the assertions contained in a pre-trial memorandum rather than the document upon which the trial judge made his mid-trial ruling, and because such emphasis runs contrary to the express intention of Appellants' counsel as reflected in the record, I must dissent.

Were I to assume, *arguendo*, that the offer of proof is properly before this court, my examination of that document leads me to a conclusion directly opposite to that of the majority. The document which Appellants' tendered to the trial court immediately prior to the ruling here under review sets forth in its entirety:

## DEFENDANTS' OFFERS OF PROOF

Now come your defendants' as captioned, and offer to present evidence as follows in support of their defense of justification:

1. Hydrogen bubble generation in Pressurized Water Reactor creates danger of radiation on release from containment vessel and consequent radiation damage to life in this area.

2. That low level radiation poses to defendants, an immediate and continuing likelihood of cancerous illness to themselves and their families.

3. That low level radiation poses to defendants and others an immediate and continuing risk of birth defects and genetic deformities.

4. That the absence of an evacuation plan for Beaver County to meet Nuclear Regulatory Commission regulations, places handicapped and disabled persons in unavoidable danger.

5. That efforts before public boards and agencies are ineffective and have been exhausted with regard to the operating nuclear power plants at Shippingport.

6. That storage and transportation of nuclear wastes in and through this jurisdiction places your defendants and the public in immediate danger of irradiation.

7. That the Nuclear Regulatory Commission has ordered a freeze on nuclear plant construction and operating licenses.

8. That design defects common to all Pressurized Water Reactors present an immediate threat to your defendants of deadly and irreparable harm from radiation release.

9. That protests as engaged in by your defendants have been and are effective in reducing the hazards of nuclear plants.

Defendants offer the following documents and reports for the same purpose:

1. As to hazards of "normal" plant operation:

A report transmitted by the subcommittee on energy and the environment:

PROCEEDINGS OF A CONGRESSIONAL SEMINAR ON LOW LEVEL IONIZING RADIATION.

2. As to hazards of "abnormal" plant operation:

KEMENY REPORT: PRESIDENTS COMMISSION ON THE ACCIDENT AT THREE MILE ISLAND AND STAFF REPORTS.

A history of federal nuclear safety assessments: from WASH 740 through the reactor safety study.

MUREG—0578—

Office of Nuclear Reactor Regulation, United States Nuclear Regulatory Commission.

3. As to the ineffectiveness of institutional measures to mitigate above hazards before regulatory and legislative bodies:

A HISTORY OF FEDERAL NUCLEAR SAFETY ASSESSMENTS, SUPRA.

4. Inadequacy and risks of current evacuation "plans":

BEAVER COUNTY OFFICE OF CIVIL DEFENSE— STANDARD OPERATING PROCEDURES RADIATION INCIDENTS—BEAVER VALLEY NUCLEAR POWER PLANT.

OP. CIT. KEMENY REPORT

5. A recent Nuclear Regulatory Commission order for freeze on nuclear plant construction and operation.

s/ Rex Downie

Rex Downie, Jr.

In deciding whether the distinguished trial judge committed error in refusing *this* offer of proof, the central issue must be whether *any* of the above offers, if proven, would assist the trier of fact in determining the existence of a reasonable belief on the part of the six people who crawled under the fence that their conduct, in sitting down, holding hands and refusing to leave private property was "necessary to avoid harm or evil to himself or to another."

I believe it prudent at this juncture to analyze the majority's interpretation of the statutory provision regarding justification, 18 Pa.C.S.A. § 503.

The section of the Crimes Code under scrutiny in this appeal sets forth in pertinent part:

### § 503. Justification generally

(a) General rule.—Conduct which the actor believes to be necessary to avoid harm or evil to himself or to another is justifiable if:

(1) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;

(2) neither this law nor the law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

Although the majority sets forth a persuasive argument in favor of permitting Appellants to present their evidence in support of this defense, I disagree with the majority's analysis of that portion of section (a)(1) of the statute which requires that the actor reasonably believe that his conduct is *necessary* to *avoid* a harm or evil greater than the harm or evil incident to their criminal conduct.

In my view, before evidence in support of a justification defense may be presented, the facts presented must satisfy an initial burden; whether the defense is available to the actor as a matter of law. In order to meet this burden, the trial court must determine that the actor's conduct was such that he could reasonably believe that his conduct was *necessary* to avoid the greater threatened harm.

I fail to see how the peaceful sit-in demonstration in the instant case could reasonably have been believed to have been *necessary* to *avoid* the threat of radiation exposure. Appellants' conduct in the instant case neither terminated nor reduced the harm which they desired to prove was emanating from the plant, nor could their conduct have done so. I would hold that in order to be entitled to a defense of justification, an actor's criminal conduct must support an inference that the criminal conduct would either *directly avoid* or *alleviate* the impending harm. *See People v. Hubbard*, 115 Mich.App. 73, 80, 320 N.W.2d 294, 298 (1982). In other words, the actor must reasonably anticipate a direct causal relationship or nexus between the actor's present criminal conduct and the contemporaneous avoidance of the perceived harm. *See Commonwealth v.*

*Averill,* 12 Mass.App. 260, 423 N.E.2d 6 (1981). *See also, U.S. v. Cassidy,* 616 F.2d 101 (4th Cir.1979); *U.S. v. Simpson,* 460 F.2d 515 (9th Cir.1972); *U.S. v. Best,* 476 F.Supp. 34 (D.Colo.1979).

Appellants' criminal trespass was a pre-planned, deliberate and calculated choice, not an action urgently necessary to avoid a danger. Their ultimate goal was the permanent closing of the plant. From my review of the record, it appears that Appellants' short term goal, to be used in reaching their ultimate goal, was to change public sentiment towards the continued operation of the plant. The trespass was merely a means of publicizing Appellants' beliefs concerning the alleged dangers inherent in the plant's operation. However, the record is clear that the plant was not operating at the time of the trespass.

I therefore conclude that the direct causal relationship needed to initiate a claim of justification cannot be established between the criminal trespass here under review and the contemporaneous avoidance of any perceived harm. Appellants were not so much concerned with their actions in committing the trespass, but rather with their subsequent arrests and the publicity which they hoped would be attendant thereto.

Nowhere in the record is there any indication that the criminal trespass could or would directly result in the immediate and contemporaneous stoppage of the emanation of low-level radiation or the immediate elimination of the alleged imminent threat or chance of a serious radiological accident.[2] Since no nexus can be shown from the record, clearly no inference of avoidance or alleviation could arise. *People v. Hubbard, supra.*

I cannot deny that the notoriety surrounding this incident may ultimately assist Appellants' cause at some future time, however, "... publicity designed to marshal public

---

**2.** My conclusion is supported in part by Appellants' proposed offer which included the presentation of evidence that *repeated* demonstrations of this kind have been and are effective in reducing the hazards of nuclear plants.

opinion could not extinguish an immediate peril, if there was one." *Commonwealth v. Averill, id* at ——, 423 N.E.2d at 7–8.

I therefore conclude that Appellants' criminal trespass alone could not reasonably be presumed to have any immediate effect in eliminating the dangers alleged to be caused by the plant. There exists no nexus between Appellants' criminal conduct and the immediate elimination of the alleged harm in the instant case.

The majority argues that section 503(a)(1) does not require that a defendant pleading justification prove that a direct causal relationship between the actor's conduct and the avoidance of anticipated harm exists. However, my reading of the statute makes plain this requirement by the inclusion of the term "avoid" in the statute. The majority's interpretation would make the legislature's inclusion of this word meaningless. Therefore, although it is clear that penal statutes are to be strictly construed in favor of the defendant, *Commonwealth v. Darush*, 256 Pa.Super. 344, 389 A.2d 1156 (1978), so too are we constrained to give effect to the obvious meaning of clear and unambiguous statutory language. 1 Pa.C.S.A. § 1921(b); *Commonwealth v. Patchett*, 284 Pa.Super. 252, 425 A.2d 798 (1981).

Also, footnote two of the majority opinion sets forth an analysis of why this defense should not be available to a defendant who has, e.g., destroyed a plant, citing to a statement that "if at any time the accused went beyond the limits of necessity, ... criminal responsibility would attach ...". If such is true, then it stands to reason that the accused whose actions *fail to reach* a degree where his actions are capable of avoiding the threatened harm must also remain criminally responsible for his actions. I also fail to understand the majority's statements in footnote two that the defense of justification *should not be available* to a defendant who has destroyed a plant in light of their determination that no nexus exists as part of the statute. I assume that the majority is saying that a legal determination is thus made *prior* to the admission of the defendant's

evidence of justification. Otherwise, the fact finder is exposed to a myriad of unnecessary evidence at trial. If such is true, that this decision is made prior to admission, then, in effect, the majority is saying what it later disavows—that a nexus analysis must be made to determine whether the defense is available as a matter of law.

The majority seems to place undue emphasis on the requirement that a jury be permitted to consider whether the beliefs of the defendants were "reasonable" without any analysis of the relationship between "reasonable belief" and "justification". Thus, the majority argues:

> By rejecting appellants' offer of the expert testimony and documentary evidence summarized in their offer of proof, the trial court precluded appellants from proving that their beliefs did have a basis in fact. Thus the court precluded appellants from proving that their beliefs were reasonable. The result was to force appellants into the position of maintaining to the jury that their trespass was justified by their private, unsupported judgment. (Page 73).

The majority goes on to acknowledge:

> To be sure, perhaps appellants would not have been able to prove justification anyway. The jury might have rejected their experts' testimony, and might have interpreted the documentary evidence differently than appellants do. But appellants were entitled to have the jury hear their evidence. (Page 73).

> If the jury had heard, and accepted, their evidence, it might have found justification. For "[t]he balancing of evils" would have disclosed, on the one side, a brief, peaceful, physically harmless trespass, and on the other, a continuing risk of catastrophic accident and the continuing infliction by low-level radiation of grave injuries. It was therefore error for the trial court to reject appellants' offer of proof, thereby precluding them from proving justification. (Page 73–74) (footnote omitted).

What I find missing in the majority's analysis is any guidance as to how the jury's conclusion as to the existence

of a reasonable belief as to a continuing risk of catastrophic accident is in any way helpful in deciding whether specific *conduct* is *necessary* to *avoid* a greater harm. If the advancement of a theory of jury nullification were the issue before us, I then would understand that the jury should be permitted to compare a "brief, peaceful, physically harmless trespass" against the "continuing infliction by low-level radiation of grave injuries". Were it that simple, I would have no difficulty in concluding, either as a juror or as a judge, that a defendant should permit his or her peers to decide which harm is greater.

However, that is not the issue. Even before it might be determined that the belief as to a particular danger or harm is reasonable, there remains the necessity for someone to decide whether there is any rational connection between the specific conduct and the *avoidance* of the identified harm. I remain unconvinced that one *avoids* low-level radiation by journeying from Pittsburgh, New Castle, Ambridge or Beaver Falls to the Borough of Shippingport with the express intention of situating oneself on private premises where nuclear reactors are located. I therefore believe that the trial court was right in excluding the testimony here under review.

The trial court's reliance on *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) is not, in my judgment, misplaced. In that case, the United States Supreme Court had to consider whether the defense of necessity or duress was available to three prisoners being tried on a charge of escape from federal custody. The prisoners sought to justify their escape by adducing evidence as to the jail's physical condition and the conduct of the guards. In holding that the availability of the duress or necessity defense depended on there being some bona fide effort to surrender or return, Mr. Justice Rehnquist stated:

> In reversing the judgments of the Court of Appeals, we believe that we are at least as faithful as the majority of that court to its expressed policy of "allowing the jury to perform its accustomed role" as the arbiter of factual

disputes. [*U.S. v. Bailey*] 190 US App DC [142] at 151, 585 F2d [1087], at 1096. The requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility. Nor is it based on any distrust of the jury's ability to separate fact from fiction. On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses. If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense.

This case presents a good example of the potential for wasting valuable trial resources. In general, trials for violations of § 751(a) should be simple affairs. The key elements are capable of objective demonstration; the mens rea, as discussed above; will usually depend upon reasonable inferences from those objective facts. Here, however, the jury in the trial of Bailey, Cooley, and Walker heard five days of testimony. It was presented with evidence of every unpleasant aspect of prison life from the amount of garbage on the cellblock floor, to the meal schedule, to the number of times the inmates were allowed to shower. Unfortunately, all this evidence was presented in a case where the defense's reach hopelessly exceeded its grasp. Were we to hold, as respondents suggest, that the jury should be subjected to this potpourri even though a critical element of the proffered defenses was concededly absent, we undoubtedly would convert every trial under § 751(a) into a hearing on the current state of the federal penal system.

Because the juries below were properly instructed on the mens rea required by § 751(a), and because the respondents failed to introduce evidence sufficient to submit their defenses of duress and necessity to the juries, we reverse the judgments of the Court of Appeals.

*Id.* at 416–17, 100 S.Ct. at 637–38, 62 L.Ed.2d at 594–95. *See also Sigma Reproductive Health Center v. Maryland,* 297 Md. 660, 467 A.2d 483 (1983) (necessity defense unavailable to trespasser at abortion clinic).

In the instant case, the majority suggests that the defendants were prepared to offer testimony and documentary evidence detailing the many and varied activities aimed at shutting down the Shippingport Nuclear Power Plant. It is clear from the trial transcript that each of the defendants was given the broadest latitude as to their testimony concerning both their beliefs and their own conduct. None of them testified to having participated in any approach to any regulatory agency involved with the Shippingport operation. Of equal importance, the Defendants' Offers of Proof, which was prepared by counsel and submitted for the express purpose of preserving specific issues on this appeal, cannot be read as offering to show that any of these defendants had made efforts before public boards or agencies.

The majority's insistence that this is not a case of civil disobedience strikes this writer as odd, inasmuch as counsel for the Appellants believed that this was exactly what this case was about. In reviewing the proposed voir dire questions submitted by counsel on the morning of jury selection and trial, this exchange is found in the trial record:

THE COURT: Let's proceed with the selection of the jury. Now, on these questions we have here—

MR. WYNN: I have not seen Mr. Downie's questions.

THE COURT: Now, I will not allow the question: "Do you believe that an act of civil disobedience is never justifiable?" I will never allow that. That's inappropriate. It would not be relevant.

MR. DOWNIE: If the jury is convinced that no demonstration is legal, I think that would be relevant. It would show bias. They see television. They see people demonstrating. These people are demonstrators. Therefore, they would adjudge them guilty.

THE COURT: Demonstration isn't an act of civil disobedience.

MR. DOWNIE: Under certain circumstances, it is. Here it's criminal trespass. They went on somebody else's property.

THE COURT: Well, that's a different question than a demonstration. Demonstration under the First Amendment rights is perfectly legal and proper if they don't commit other crimes.

MR. DOWNIE: All I meant to get at by that, your Honor, is: *This is civil disobedience. We agree with that. My clients know that the law forbad their doing what they did.*

(N.T. 9–10). (Emphasis supplied).

This position of counsel is borne out by the defendants' own testimony. Stephen Anderson testified:

We broke the law with both eyes open because when the law is allowing the possibility and the concordization [sic] of a nuclear power plant that is spewing out radioactive substances into the Ohio River—... I would just say, also, that I did this out of a biblical motivation to see justice done and to have peace and believe in the sanctity of human life and not in the trodding over of it. (N.T. 84, 85).

Vincent Scotti, another defendant,[3] testified:

The reason why we went under the fence was not in any way to attempt to take over the nuclear power station, but it was a nonviolent counterpresence to the violent presence of the nuclear power plant. *All we simply hoped to accomplish by going under the fence was to draw attention to the issue of nuclear power.* (N.T. 98, emphasis added).

In the same vein, Sue Heilman testified:

I decided to go under the fence that day at Shippingport because I felt it was time to lay my life on the line for something I believed in very strongly which is that that plant should be shut down. (N.T. 100).

**3.** See footnote 1.

Edward Wagner gave as his reason for going under the fence:

> In my own words, first off, was for my family, my parents, my younger brothers and sisters, for they drink the water from the Service Creek Reservoir which is better known as the Ambridge Reservoir ... Shippingport has released radiation in excess of government regulations subjecting my family to radiation in their water. That was the first reason and the main reason.

The majority seeks to distinguish the civil disobedience cases by defining civil disobedience as breaking a law on the grounds that the law is immoral. The majority argues that in a typical civil disobedience case the actor recognizes, and perhaps expects, that the court may uphold the law, and if that occurs, the actor is willing, perhaps eager, to accept the punishment prescribed. On my review of the trial transcript (as opposed to the majority's preoccupation with the pre-trial memorandum) I find that the testimony of the Appellants fits into even the majority's understanding of civil disobedience.

Since I find that no nexus exists between the actual conduct of the Appellants and the avoidance of any alleged greater harm, I view it as unnecessary to consider the preemption doctrine which the majority analyzes and finds inapplicable.

At oral argument, all parties requested that this court provide guidance for future cases involving demonstrations at nuclear sites. I find little guidance, and less solace, in the majority's observation relegated to footnote 2 (p. 468) that "the defense of justification should not be available to a defendant who has destroyed a plant." To suggest to our trial courts that they are free to exclude expert testimony in cases where plants have been destroyed while furnishing no guidance as to the minimal averments required to sustain an offer of proof in other cases is, in my judgment, less than helpful. If I understand the interpretation which the majority would place on Section 503 of the Crimes Code, our

trial courts must now be prepared to receive testimony in numerous cases which challenge the operation of our various systems. If "reasonable belief" is the touchstone, should not a defendant charged with obstructing administration of law or other governmental function have the right to present "expert testimony" on the weaknesses and failures of our system of judicial administration if he is arrested for entering a conference of our court's judges without permission and refusing to leave? Does City Hall have to be blown up before a citizen is precluded from introducing testimony on the evils and corruption of a governmental agency which might, to a jury, support a "reasonable belief" that invasion of private conferences of a court is the only remaining avenue to seek redress? May a person now defend against a charge of larceny by presenting the testimony of economists and social psychologists that the peaceful, physically harmless act of stealing produce or meat from a grocery chain store is more than "balanced", to use the majority's term, by the pressures and inequities of our present socioeconomic system?

Until this court is able to provide more precise parameters as to the availability of the justification defense, I am prepared to continue my dissent.

HESTER and WIEAND, JJ., join in this opinion.